PACIFIC NORTHWEST GENERATING COOPERATIVE, Plaintiff,

v.

Ronald BROWN, et al., Defendants.

The ALUMINUM COMPANY OF AMERICA, et al., Plaintiffs,

v.

Ronald BROWN, et al., Defendants.

PUBLIC POWER COUNCIL, Plaintiff,

v.

Ronald BROWN, et al., Defendants.

Civ. Nos. 92–973–MA, 92–1260–MA and 92–1264–MA.

United States District Court, D. Oregon.

April 1, 1993.

R. Erick Johnson, Stuart Jones, William Masters, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, OR, for plaintiff PNGC.

Jeffery Ring, James Buchal, Gary Firestone, Heller, Ehrman, White & McAuliffe, Portland, OR, for plaintiffs Aluminum Co. of America, et al.

Gregory Miner, Cynthia Lombardi, Bogle & Gates, Portland, OR, for plaintiff PPC.

Charles Turner, U.S. Atty., Thomas Lee, Asst. U.S. Atty., Portland, OR, Fred Disheroon, Special Litigation Counsel, James Kilbourne, Charles Shockey, U.S. Dept. of Justice, Environment and Natural Resources Div., Washington, D.C., for defendants.

Thane Tienson, Copeland, Landye, Bennett & Wolf, Portland, OR, for intervenor Salmon for All.

Robert Costello, Office of the Atty. Gen., Olympia, WA, for intervenor State of Wash.

Theodore Kulongoski, Stephanie Striffler, Special Litigation Unit, Oregon Dept. of Justice, Salem, OR, Cheryl Coon, Oregon Dept. of Justice, Portland, OR, for intervenor State of Or.

Mark Rutzick, Doug Blomgren, Preston, Thorgrimson, Shidler, Gates & Ellis, Portland, OR, Bruce Smith, Roshalt, Robertson & Tucker, Boise, ID, for intervenors Northwest Forest Resource Council, et al.

Don Olowinski, Richard Burleigh, Hawley Troxell Ennis & Hawley, Boise, ID for intervenor Coalition for Idaho Water.

Victor Sher, Todd True, Adam Berger, Sierra Club Legal Defense Fund, Seattle, WA, Neil Kagan, Portland, OR, for intervenors Northwest Resource Information Center, Inc., American Rivers, Oregon Natural Resource Council and Federation of Fly Fishers.

Larry Echohawk, Clive Strong, William Whelan, Boise, ID, for amicus State of Idaho.

Howard Arnett, Karnopp, Peterson, Noteboom, Hubel, Hansen & Arnett, Bend, OR, for amicus Confederated Tribes of the Warm Springs Reservation.

Douglas Nash, Nez Perce Tribal Executive Committee, Lapwai, ID, for amicus Nez Perce Tribe.

Tim Weaver, Cockrill & Weaver, Yakima, WA, for amicus Yakima Indian Nation.

Richard Reich, Eric Nielsen, Taholah, WA, for amicus Quinault Indian Nation.

Marc Slonim, John Arum, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, WA, for amicus Makah Tribe.

Daniel Hester, Fredericks, Pelcyger, Hester & White, Boulder, CO, for amicus Umatilla Indian Reservation.

## OPINION

MARSH, District Judge.

Plaintiffs filed these actions claiming that defendants violated the Endangered Species Act (ESA) with respect to actions taken affecting recently listed salmon species. The linchpin of plaintiffs' dispute with defendants relates to the technical and economic impact of defendants' decision to augment flows over dams in an effort to improve juvenile fish migration: plaintiffs submit opinions from biologists declaring that flow augmentation has an insignificant impact upon the protection of the listed salmon species, while arguing that these measures contribute to increased power rates. Plaintiffs proffer, again by expert declarations, that a reduction in salmon harvests would have a significantly positive impact upon the species while posing a comparatively minimal economic burden on commercial fishing interests.

However, like the salmon's attempt to return to its natural spawning ground, before reaching the merits of these actions, plaintiffs must first survive the long migration through the many procedural barriers which must be considered by the judicial system in order to comply with the United States Constitution. By raising these procedural jurisdictional dams, defendants now seek summary judgment against all claims in these actions on the basis that plaintiffs fail to satisfy the "cases" and "controversies" elements of Article III, § 2 and because indispensable parties cannot be joined. Two of the plaintiffs seek partial summary judgment on claims for declaratory relief on the application of "incidental take" permits to commercial harvests. While plaintiffs' views on one of the most complex and multi-faceted challenges facing the Pacific Northwest may

well be as valid as any other, I find that, like many of the salmon these days, their claims simply cannot survive the journey home. Thus, for the reasons that follow, defendants' motions are granted and plaintiffs' motions for partial summary judgment are denied.

## I. Introduction & Overview

### a. The Fish

The Columbia River, its largest tributary, the Snake River, and their surrounding environments provide residents of the Northwest with vast and invaluable resources. One of their most notorious resources is the anadromous salmon, two species of which have recently been listed as endangered or threatened by the National Marine Fisheries Service (NMFS). The NMFS determined that the Snake River sockeye salmon constituted an endangered species pursuant to the ESA. The listing became effective December 20, 1991. The NMFS determined that the Snake River spring/summer chinook and Snake River fall chinook were threatened species, and this listing became effective May 22, 1992.[1]

The "listing process" for these salmon species began in 1978 and included 13 years of biological study.[2] Scientists estimate that the population of Snake River spring/summer chinook has steadily decreased from 1.5 million in the late 1800s, to an average of 125,000 during the 1950s, to lows of wild fish ranging from 3,343 fish to 21,870 from 1980 to 1988. April 10, 1992 Biological Opinion, p. 13. Snake River fall chinook have experienced similar trends, decreasing from an historical high of 72,000 wild fish to 78 in 1990 and 318 in 1991. *Id.*, at 14–15. According to Idaho Fish and Game records, Snake River

---

1. When discussing salmon species, biologists distinguish them by "seasonal races" or "runs" and "tributary stocks" and river "substocks." Thus, the listed Snake River fall chinook is a fall race and a Snake River stock. All chinook passing Bonneville Dam from March through May are counted as upriver "spring" chinook. "Summer" chinook are counted at Bonneville Dam from June 1 through July 31 and at McNary Dam from June 9 through August 8 and are destined for the Salmon River drainage in Idaho (early migration) and the upper Columbia above Priest Rapids Dam (later migration). "Fall" chinook enter the Columbia from late July through early

October, with the majority of the upriver brights destined for Hanford Reach on the mainstem of the Columbia.

2. The NMFS utilizes the following factors in determining whether a species should be listed as endangered or threatened: (1) the present or threatened destruction, modification of its habitat; (2) overutilization for commercial, recreational, scientific or educational purposes; (3) disease and predation; (4) the adequacy of existing regulatory mechanisms; and (5) any other natural or manmade factors affecting its existence. 16 U.S.C. § 1533(a)(1), ESA § 4(a)(1).

sockeye salmon reached a known historical escapement peak into Redfish Lake of 4,361 in 1955, compared to an escapement of 4 in 1991.

Plaintiffs do *not* challenge the validity of the listings. Further, there is no dispute that the Snake River sockeye is a distinct population segment of the species *Oncorhynchus (O.)* [3] *nerka,* and that the Snake River spring/summer chinook and the Snake River fall chinook are distinct population segments of the species *O. tshawytscha,* and thus, each constitutes a protectable "species" for the purposes of the ESA.[4] There is also no dispute that, although classified as a distinct stock, the listed species are identical in physical appearance to non-listed stocks of the same race.

The listing of these salmon species has, and will continue to have, a significant impact upon at least four river activities directly at issue in this case:

(1) **harvest**—of salmon for commercial, sport-recreational and tribal uses;

(2) **habitat**[5]—which includes the 1,270 miles of Columbia River water (745 of which lie in the United States), 1,038 miles of the Snake River, and adjacent land uses including timber harvests, road building, grazing, mining, farming, and recreation;

(3) **hatcheries**—which release fish into the Snake and the Columbia rivers to increase harvest, but which may have a detrimental effect on wild stocks due to increased fishing pressure, increased predation,[6] competition for limited food resources, spread of disease, and potential adverse genetic effects;[7] and

(4) **hydropower**—from operations generated from hydroelectric dams operated by the Army Corps of Engineers (COE), the Bureau of Reclamation (BOR) and various private power companies. Hydroelectric power produced by the COE and BOR is marketed by the Bonneville Power Administrations (BPA).

Although the listings have been anticipated for years, the action has come at a particularly critical time in the Pacific Northwest. According to the 1991 Northwest Power Plan, for the first time since the Northwest Power Act (NWPA) was passed in 1980, population increases and other changes have made it

3. The genus name "Oncorhynchus" means "hooked snout" and is derived from Russian because they were first described by a naturalist on the Bering expedition in 1737. Wilkinson and Conner, *Law of the Pacific Salmon Fishery,* 322 Kansas L.Rev. 17, 18 n. 2 (1983).

4. Chinook are divided into two groups: "stream-type" which spend one or more years in fresh water, then two to four years at sea before returning to fresh water for several months before spawning; and "ocean-type" which migrate to the sea in their first year to return two to four years later just a few days or weeks before spawning. The chinooks' range is from the Ventura River in California to Hokkaido, Japan.

Most sockeye remain in lakes for one to three years before spending one to four years in the ocean, with most spawning taking place from August to November. However, some sockeye stocks known as "kokanee" remain in fresh water and never migrate to the ocean. The sockeyes' range is from the Klamath River, California to Hokkaido.

There are actually five species of anadromous Pacific salmon in North America which also include the *O. kisutch* (coho or silver); *O. keta* (chum or dog), and *O. gorbuscha* (pink or humpback). Coho spend a large part of their residence in freshwater and their range is from Monterey Bay, California to Hokkaido. Chum migrate to sea almost immediately and spawn in coastal streams when they return. Chum have the broadest geographic range of the Pacific salmon extending from Pusan, Korea to the Sacramento River, California. Pinks also spawn near the ocean and their ranges are in North Korea and in North America from the Sacramento River to the Mackenzie. Robert Steelquist, *Field Guide to the Pacific Salmon,* 19–23 (Sasquach Books 1992); and W.B. Scott and E.J. Crossman, *Freshwater Fishes of Canada,* 148–177 (Fisheries Research Board of Canada, Bull. 184, 1973).

5. Habitat for the listed salmon species are found on parts of ten national forests in Oregon, Washington and Idaho. *See* Affidavit of John Lowe, Regional Forester for the Pacific Northwest Region.

6. Some of the salmon's predators, such as Oregon coastal harbor seals and California sea lions, are protected under the Marine Mammal Protection Act of 1972, 16 U.S.C. § 1361, *et seq.*

7. For a disheartening, semi-historical account of failed hatchery attempts in the State of Washington and the impacts of "genetic pollution," see, B. Brown, *Mountain in the Clouds: A Search for the Wild Salmon,* 99–162 (1982); *Cf.* Wilkinson & Conner, p. 85–86, n. 361 (discussing experimental salmon "ranching" projects). *See also* NMFS, "Factors for a Decline," the listing report of June 1991, at p. 29.

impossible for the Northwest to be an energy exporter. We have absorbed all of what was our formerly "excess power," and are now forced to look to new power sources.

In 1992, the COE and the BOR increased water flows in the Federal Columbia River Power System (FCRPS) for the purpose of benefitting the migration of juvenile listed species. However, this action diminished the use of the water for power production and thus reduced the amount of power available to the BPA for marketing and increased costs of power supply by $60 million. Stipulated Facts # 58, 59 & 65. Increased costs from 1992 operations will initially be paid from BPA's financial reserves, but the BPA expects to recover its increased costs from its customers. Stipulated Facts # 67 & 79. Salmon "water budgets"[8] place a stress on the Columbia River system, as do the recent loss of nuclear power supplements, six continuous years of drought conditions, warming effects of El Nino, and increased pressure from the federal government to require the BPA to repay almost $1 billion in federal loans. See the 1991 Northwest Power Plan. However, as far as the salmon are concerned[9], the most significant "stress" upon the river resource is industrial and consumer electric usage which rely upon the dams and hydropower operations. According to the June 1991 NMFS report, "Factors for a Decline A Supplement to the Notice of Determination of Snake River Spring/Summer Chinook Salmon Under the Endangered Species Act," eight million of the ten million historical losses of salmon and steelhead is attributable to hydropower development and operation. Further, as of 1991, cumulative mortality rates for juvenile spring/summer chinook salmon passing the eight mainstem hydroelectric projects is estimated to be as high as 91%.

Another historically significant factor contributing to the decline of the salmon runs is "overutilization." The NMFS estimates that commercial and recreational harvest of chinook salmon peaked in the early 1880s at about 2 million fish annually. Salmon canneries in Astoria, Ilwaco, Portland and The Dalles flourished around the turn of the century—expanding production from 6,000 cases of 48 one-pound cans in 1866 to a record setting 43 million pounds on the Columbia in 1883. See Anthony Netboy, *The Columbia River Salmon and Steelhead Trout: Their Fight for Survival*, 19–23 (University of Washington Press, 1980). Over the past few decades, however, most of the canneries have gone and timing and method restrictions have resulted in seasons that are limited to days, and sometimes only hours, with actual ocean and in-river catches down to the thousands for some stocks and the tens for others. Thus, although harvests historically "substantially contributed" to the salmon's decline, the NMFS noted that current harvest levels have been "greatly curtailed" in commercial, recreational and Indian fisheries due to the efforts of participants in the Columbia River Fish Management Plan (CRFMP) to protect the fish.[10]

b. The Cases

Plaintiffs filed three separate actions against Ronald Brown, Secretary of Commerce[11] and other federal agencies alleging violations of the ESA, 16 U.S.C. § 1531 *et seq.* pertaining to protection of the Snake River sockeye, Snake River spring/summer chinook and the Snake River fall chinook salmon. Although these actions and the plaintiffs are not identical, plaintiffs represent similar high volume "user" interests in hydropower operations, assert similar claims and seek similar relief.[12] Thus, they have

8. According to the Northwest Power Planning Council, "water budget" refers to a block of water set aside for release during the spring runs to "create an artificial freshet that speeds juvenile fish to the ocean." *See e.g.* The 1987 Columbia River Basin Fish and Wildlife Program § 302.

9. Irrigation is the major "consumptive" draw upon the water resource in the Snake River system, and a "significant" factor in the Columbia River Basin. NMFS, June 1991 Report, at p. 15–16.

10. Recent reports also indicate that researchers may have been overestimating ocean fish runs used to determine allowable catch rates.

11. The complaint originally named former Secretary of Commerce, Barbara Franklin.

12. In addition, plaintiffs submitted joint 60–day letters of "Notice of Intent to Sue for Violations of the Endangered Species Act" to defendants on May 21, 1992, with a follow-up confirmation adding the Columbia/Snake River Irrigators Association, et al., on July 1, 1992.

been consolidated for the purpose of discovery and case management. Each of these cases was assigned to me because several of the claims asserted and relief sought by plaintiffs "challenge" harvest activity under the CRFMP which, as amended, was adopted by this court on October 7, 1988. *See United States v. Oregon,* 699 F.Supp. 1456 (D.Or. 1988), *aff'd,* 913 F.2d 576 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991).[13] The CRFMP is a delicate, but effective structure for allocating and planning harvest activities. As I noted in an opinion last February:

"The factual circumstances that exist in this case are unique ... [There is an] absolute need for *coordinated* and centralized management of fish resource management in the Columbia River to protect fish and the balance between treaty Indian and non-treaty fisheries ... If Compact members or non-parties are permitted to interfere with this carefully balanced process ... the state's fisheries management departments would be confronted with confusion and chaos."

*United States v. Oregon,* Civ. No. 68–513–MA (February 29, 1992) (order granting Washington's motion for a restraining order against an injunction issued by the Circuit Court of the State of Oregon for Clatsop County). While I can hardly describe the subject matter in *U.S. v. Oregon* as "narrow," its central concern addresses only one river activity—harvest. The present actions force the scope of the subject matter even wider to encompass the four river-related activities described above. Thus, although the focus of these present actions is much broader, it was with a continuing desire to avoid both confusion and chaos and to preserve what I feel is an essential "big picture" perspective, that the case management committee and the Chief Judge of this district determined that cases which may impact the CRFMP, and which relate to salmon harvest activities on the Columbia, be brought before me, as the judge presiding in *U.S. v. Oregon.*

## II. Governing Acts & Agencies

Government regulation of the Columbia River resources is varied and complex, to say the least. The following is a brief description of a few of the Acts and regulatory agencies implicated, either directly or indirectly, in the present actions.[14] The Endangered Species Act is, obviously, our central focus. However, many of the challenged activities in this case must be examined in their full regulatory and historical context before basic structural issues of standing, ripeness/mootness and necessary parties can be adequately addressed.[15] For example, plaintiffs' claimed

13. Signatory parties to the Plan include the United States of America, the Nez Perce Tribe, the Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes of the Warm Springs Reservation, the Confederated Tribes of the Yakima Indian Nation, the States of Oregon, Washington, and Idaho, and, subject to certain defined limitations, the Shoshone–Bannock Tribe.

The CRFMP is inextricably intertwined with plaintiffs' claims in these cases because it is the seminal document governing in-river **harvest** activities. The CRFMP determines fishing seasons and allocates harvests to both treaty Indian and non-Indian fisheries. The NMFS cooperates with the CRFMP though the Plan's Technical Advisory Committee (TAC). Preservation and conservation of the species through management, planning and study have been integral components of the CRFMP since its inception. *See* Sec. I.B.2, Sec. I.F.1, Sec. II.D.2, and Section III.

14. Other Acts applicable to wildlife and power regulation, but not addressed here, include the Salmon and Steelhead Conservation Act of 1980, 16 U.S.C. § 3301 *et seq.,* the Federal Power Act, 16 U.S.C. § 791a–825, the Federal Columbia River Transmission System Act, 16 U.S.C. § 838 *et seq.,* the Mitchell Act of 1938, 16 U.S.C. § 755–757, the 1985 Pacific Salmon Treaty between the U.S. and Canada and a number of state laws and regulations.

15. If this background discussion of the agencies, acts and challenged actions seems long and unduly complicated, don't shoot the messenger. As experienced commentators have noted—

"Congress and the courts, in their determined efforts to extend a measure of protection to a threatened resource and to allocate its harvest more fairly, have unwittingly multiplied management authority to the point where the very institutions designed to protect the resource have now, by virtue of their numbers and their unwieldiness, become an additional threat. Like the sorcerer's apprentice of Goethe's fable, today's salmon managers are perhaps more in peril of being overwhelmed by the "solution" than by the remaining problems."

Wilkinson & Conner, *supra* at 104. This observation was made eight years prior to the listing of the salmon stocks, and thus, was made without the benefit of yet *another* layer of regulatory restriction from the ESA.

"injuries" relate primarily to increased costs of hydroelectric power traceable to increased expenditures by the BPA on salmon conservation programs. The BPA does not, however, participate in such programs of its own initiative, but is *required* to do so through the Pacific Northwest Electric Power and Conservation Planning Council under the Northwest Power Act (NWPA), 16 U.S.C. § 839(6), 839b(a)(2), (e)(1) & (h). (1980).

In describing these various agencies, councils and statutes, my primary intent is not only to broaden our focus and place the issues in perspective, but also to draw attention to the procedural complexity of applying the Endangered Species Act to an area that is already heavily laden with sometimes overlapping regulations and regulators. Not only are there already separate statutes designed specifically to promote conservation of salmon and steelhead, 16 U.S.C. § 3301, *et seq.,* but there are also wildlife conservation measures within the Acts governing harvest and hydropower regulations. In determining to list the salmon stocks, the NMFS considered these existing regulations and regulatory agencies and noted that they had failed to prevent the decline of the species for three primary reasons: (1) measures designed to protect the species are not mandatory or specific enough to enforce; (2) inadequate funding to implement proposals; and (3) failure to meet guidelines, such as water budgets set aside to improve juvenile fish migration.[16] This commentary is not meant to in any way question the validity of the ESA or its application to Pacific Northwest salmon stocks, but is merely offered as a preface that any analysis of the introduction of the ESA into the complex, multi-state river management operation must be approached with care.

*1. The Endangered Species Act*

The Endangered Species Act, 16 U.S.C. § 1531, *et seq.,* was enacted by Congress in 1973 to conserve endangered and threatened species. Unlike several of its predecessors,[17] the 1973 Act eliminated the proviso that endangered species be protected "where practicable" and directed instead that the "balance [be] struck in favor of affording endangered species the highest of priorities." *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 180–181, 195, 98 S.Ct. 2279, 2295, 2302, 57 L.Ed.2d 117 (1978); *see also Sierra Club v. Marsh,* 816 F.2d 1376, 1383 (9th Cir.1987) (noting that ESA significantly restricts court's equity jurisdiction). Section 9 is a substantive provision which prohibits certain activities related to species that are designated as endangered or threatened. Specifically, § 9 makes it unlawful for any person to "take ... possess, sell, deliver carry, transport or ship" any endangered species and provides civil and criminal penalties for violations of its provisions.

Section 7 of the ESA imposes both substantive and procedural requirements upon federal agencies and requires that agencies "insure that any action authorized, funded or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered or threatened species." § 1536(a)(2). This general proscription covers direct threats to species as well as destruction or adverse modifications to "critical" habitat. *Id.* Section 7 prescribes a three-step process which includes an initial screening to determine if an endangered species "may be present," and a biological assessment to determine if the species is "likely to be affected." If the answers to steps one and two are both yes, the Act requires the action agency to engage in "formal consultation" with the U.S. Fish and Wildlife Service (FWS) or NMFS. Following consultations, the FWS or NMFS issues a biological opinion as to whether a project is likely to jeopardize a species or adversely modify its critical habitat. § 1536(a)(2); *Thomas v. Peterson,* 753 F.2d 754, 763 (9th Cir.1985). While formal consultation will satisfy the

---

**16.** According to the NMFS June 1991 report, the April to June 1991 water·budget was 1.19 MAF for the Snake River. However, the amount actually obtained ranged from .44 to .48 MAF. *See also* Affidavit of Frank Young (explaining 1992 flow augmentation provisions).

**17.** For an historical review of the so-called "toothless tigers," which include the Lacey Act, the Migratory Bird Treaty Act of 1934, The Endangered Species Preservation Acts of 1966 and 1969 and the Marine Mammal Protection Act of 1972, *see* Daniel Rohlf, *The Endangered Species Act,* 19–23 (Stanford Env. Law Society) (1989).

agency's procedural obligation under § 7, an agency's reliance upon a biological opinion issued by the NMFS must nevertheless be "reasonable" to satisfy the act's substantive obligations. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dept. of Navy*, 898 F.2d 1410, 1415 (9th Cir.1990). The consulting agency is directed to utilize the "best scientific and commercial data available." § 1536(a)(2).

In 1982 Congress amended the ESA to create an exception for "incidental" takings of listed species to avoid the dilemma created whereby a proposed action might be permissible under § 7(a)(2), but be prohibited by the broader proscription contained in § 9. *See,* H.R. No. 567, 97th Cong., 2d Sess. 26 (1982). "Incidental takings" may be authorized if they occur during the course of an otherwise lawful activity and where such a taking does not jeopardize the continued existence of the species or destroy or adversely modify critical habitat. § 1536(a)(2), (b), (h). An incidental take statement accompanies a biological opinion and, where possible, must specify the impact of the take on the species. § 1536(b)(4); *see also* H.R. 567, 97th Cong., 2d Sess. 27. The limited taking must be incorporated into "terms and conditions" imposed to minimize the impact on the listed species along with "reasonable and prudent" mitigation measures. *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1580 (9th Cir.1993). If an anticipated take is exceeded, the agency or permittee must "immediately re-initiate consultation." *Id.*, 50 C.F.R. § 402.14(i)(4).

Private parties may also "incidentally take" listed species without violating § 9, by obtaining an incidental take permit, also known as a "§ 10 permit" from NMFS or the FWS pursuant to § 1539. For example, private hatchery operators obtained § 10 permits from the FWS in 1992 to take listed species for use as broodstock. *See* Deposition of William Shake, at 67–68.

Section 11 of the Act provides for citizen suits, and mandates that agency action be given deference upon judicial review unless the action is "arbitrary, capricious or other-wise not in accordance with the law." 5 U.S.C. § 706; *Delaney v. E.P.A.*, 898 F.2d 687, 689 (9th Cir.), *cert. denied,* 498 U.S. 998, 111 S.Ct. 556, 112 L.Ed.2d 563 (1990). Especially in those instances where agency judgment involves "technical expertise," or where specialists express conflicting views, judicial review is limited to an assessment of whether the agency "conducted a reasoned evaluation of the relevant information and reached a decision that, although perhaps disputable, was not arbitrary or capricious." *Mt. Graham Red Squirrel*, 986 F.2d at 1576, 1580.

Other provisions of the ESA are designed to further conservation through acquisition of habitat (Section 5) and establishment of cooperative agreements with states (section 6). In addition, Section 4(f), 16 U.S.C. § 1533(f), requires the Secretary to develop and implement "recovery plans" for all listed species. NMFS/FWS regulations define the term "recovery" as "improvement in the status of listed species to the point at which listing is no longer appropriate." 50 C.F.R. § 402.02. Thus, the ultimate goal of the ESA is "to make itself obsolete." Rohlf, *supra* note 17, at 100.

### 2. In–River Management

Harvest allocation for chinook, sockeye, sturgeon, shad, walleye, steelhead, coho and lamprey in the Columbia River is vested in the CRFMP whose participants include tribal governments [18] and representatives from the states of Oregon and Washington who are members of the Columbia River Compact.[19] Other signatories to the plan include U.S. governmental agencies (FWS, the Bureau of Indian Affairs (BIA), and NMFS), the State of Idaho and, subject to limitations, the Shoshone–Bannock Tribe. CRFMP § I.G. The CRFMP was originally formulated as a partial settlement of *U.S. v. Oregon* and is augmented by annual management plans. Regulatory authority resides with the Columbia River Compact through respective state laws in Oregon and Washington.

---

**18.**  See footnote 13, *supra.*

**19.**  The Compact between Oregon and Washington was created in 1918 and is the oldest coordi-nation compact relating to anadromous fish management. Act of April 8, 1918, Pub.L. No. 65–123, 40 Stat. 515 (1918).

The CRFMP is the in-river analogue to the Pacific Fisheries Management Council (addressed *infra*) in that it provides the framework for management and allocation of state and tribal fisheries in the Columbia River. Members participate in the formulation of fishery regulations, harvest goals and decisions affecting area closures, seasons and gear restrictions. *See generally* Affidavits of Burnell Bohn (Oregon Dept. of Fish & Wildlife) and Jean Edwards (Inter–Tribal Fish Commission) (description of Plan framework, implementation, goals and post-listing response).

Commercial non-Indian gillnet fishing takes place on a 140–mile stretch of the river from the mouth of the Columbia up to Bonneville Dam. This portion of the river has been divided into five management zones ("Zones 1–5") which correspond to Washington county boundaries. The gillnet fishing season varies from year to year depending upon run size projections, escapement goals, projected harvest efficiency, and the expected proportion of wild to hatchery fish. *See Generally*, CRFMP "management goals" and Wilkinson & Conner, p. 75–76, n. 306. From Bonneville to McNary dams (Zone 6), tribal ceremonial and subsistence (C & S) fisheries are entitled to a minimum catch of spring and summer chinook, while mainstem platform tribal fisheries are subject to limitations based upon Technical Advisory Committee (TAC)[20] preseason estimates of anticipated catch.[21]

### 3. *Ocean Management*

Pacific Ocean harvests are governed by a similar but separate regulatory scheme. The Fishery Conservation and Management Act (FCMA, aka the Magnuson Act), 16 U.S.C. § 1801, *et seq.* (1976), created two regional councils. The Pacific Fishery Management Council (PFMC), is headquartered in Portland, Oregon, with members which include the states of California, Oregon, Washington and Idaho. The North Pacific Fishery Management Council (NPFMC), is headquartered in Anchorage, Alaska, and is comprised of representatives from Alaska, Washington and Oregon.

The PFMC is responsible for the Pacific Fish Management Plan which is the framework for commercial, recreational and tribal ocean harvest of mixed stocks.[22] The NPFMC manages salmon fisheries off the coast of Alaska in the U.S. Exclusive Economic Zone (EEZ), 3–200 miles offshore. Like the CRFMP, the PFMC and the NPFMC adopt plans which ban or permit certain types of fishing, and which set maximum sustainable yields, allowable biological catches and area and timing restrictions within the EEZ. Fishing within three miles of the coastline is regulated by the respective coastal state in concert with Council plans. Both councils are responsible for preparing and monitoring management plans for each "major harvestable marine species" within their geographic jurisdiction. *See Generally,* Wilkinson & Conner, *supra,* at 48–53; 16 U.S.C. § 1852(a)(6) & (7).

**20.** The TAC was established by the CRFMP to "develop, analyze and review data," regarding harvest management. TAC recommends harvest regulations, run size, timing and opening and closures of seasons. CRFMP, IV.A. In addition to TAC, the Plan also utilizes the services of a Production Advisory Committee (PAC) to coordinate production and harvest information, and make recommendations regarding hatchery operations. CRFMP, IV.B.

**21.** The CRFMP specifically recognizes that treaty tribes *must* be accorded the opportunity to harvest their share of the fishery resources at their "usual and accustomed" fishing areas, subject only to "conservation requirements." CRFMP I.B.2; *see also Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 673 n. 20, 99 S.Ct. 3055, 3068 n. 20, 61

L.Ed.2d 823 (1979) ("[S]emi-sovereign status of Indians justifies special treatment on their behalf.").

**22.** The Quinault Indian Nation and the Hoh and Quileute Indian Tribes exercise rights to harvest salmon in ocean fisheries off the Washington coast as successors to the Treaty with the Quinault. *United States v. Washington,* 384 F.Supp. 312, 372–74 (W.D.Wash.1974), *aff'd,* 520 F.2d 676 (9th Cir.1976), *aff'd sub nom. Washington v. Washington Commercial Passenger Fishing Vessel Assn.,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). The Makah Indian Tribe was a party to the Treaty with the Makah, and thus it also exercises rights to fish in usual and accustomed fishing grounds off the coast of Washington. *Id.,* at 364.

Under the Magnuson Act, conservation and management plans must be designed to prevent overfishing and maintain an optimum sustainable yield. 16 U.S.C. §§ 1851(a)(1), 1853(a). Conservation measures must be based upon the "best scientific information available" and should promote "efficiency in the utilization of fishery resources" while minimizing costs "where practicable." § 1851(a)(1)–(7).

### 4. Habitat Management

The Fish and Wildlife Coordination Act, 16 U.S.C. § 661, *et seq.*, was originally enacted in 1934 to "provide that wildlife conservation shall receive equal consideration and be coordinated with other features of water-resource development, maintenance and coordination of wildlife conservation and rehabilitation." § 661 (1958). Under the Act, the Department of the Interior is charged with responsibility for assisting federal, state and private entities involved in habitat management by conducting surveys and investigations to minimize adverse impacts on wildlife. *Id.* For example, any government agency or private entity must "consult" with the FWS "with a view to the conservation of wildlife." § 662. The Act also designates a national Wildlife Refuge system, and provides for administration and enforcement of mining, mineral leasing, hunting and fishing. § 668dd.

Another significant statute governing habitat activities in National Forests is the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331, *et seq.* (1970). NEPA is a procedural statute enacted for the purpose of ensuring that cultural, historical and environmental preservation will be considered as factors in carrying out federal plans, functions and programs. *Id., see also Save the Yaak v. Block,* 840 F.2d 714, 717 (9th Cir. 1988) (under NEPA, agency action will be set aside if procedures are not followed). NEPA requires all federal agencies to prepare detailed statements of anticipated impacts of any proposed "major federal actions significantly affecting the quality of the human environment." § 4332((2)(C). Thus, the "action agency" will produce an environmental assessment (EA) or an environmental impact statement (EIS). *See e.g. Seattle Community Council Federation v. F.A.A.,* 961 F.2d 829, 831–32 (9th Cir.1992) (explaining NEPA procedures). If the agency concludes that a proposed action (such as a timber management plan) will have no significant impact, it will issue a "Finding of No Significant Impact," (FONSI). *Id.,* § 1501.4. Like biological assessments and biological opinions, EAs and EISs include mitigation requirements as part of a permit process. § 4332(E), (G).

Judicial review of an EA or an EIS produced under NEPA is available via the Administrative Procedures Act, 5 U.S.C. § 706(2)(A). Thus, for example, an EIS issued by the Bureau of Land Management for an off-road motorcycle race over public desert land may only be reversed if a court finds the action to have been "arbitrary, capricious, or an abuse of discretion." *Sierra Club v. Clark,* 774 F.2d 1406, 1410 (9th Cir. 1985). Similarly, an agency's decision not to prepare an EIS must be upheld if the agency took a "hard look" at the environmental consequences and made an informed decision. *Friends of the Payette v. Horseshoe Bend,* 988 F.2d 989, 992–93 (9th Cir.1993).

### 5. Power Management

The Northwest Power Planning Act, 16 U.S.C. § 839 (1980), was enacted by Congress as a "comprehensive energy charter" for the Pacific Northwest. *See* § 839; and Wilkinson & Conner, p. 53. The Act is designed to promote an efficient use of Columbia River resources to bring about an "adequate, efficient, economical, and reliable power supply," while providing environmental quality *and* while acting in a manner which is "consistent" with environmental laws. § 839. The Act provides for regional planning and participation through the creation of the Pacific Northwest Electric Power and Conservation Planning Council. § 839b. Members of the council include two persons each from Idaho, Montana, Oregon and Washington with participation by the BPA.

The Council was given two years from the date of establishment to prepare and adopt a regional "conservation and electric power plan." § 839b(d)(1). In creating the plan, Congress provided the Council with a mandatory list of priorities:

"The plan shall ... give priority to resources which the Council determines to

be cost-effective. Priority shall be given: first, to conservation; second, to renewable resources; third, to generating resources ... and fourth, to all other resources." § 839b(e)(1). In addition, Congress provided a list of factors the Council must consider in developing the plan, including environmental quality, compatibility with the existing regional power system, protection and enhancement of fish and wildlife "including sufficient quantities and qualities of flows for successful migration, survival and propagation of anadromous fish." § 839b(e)(2); and § 839b(h)(6)(E)(ii). Section 839b(h) mandates the development of a fish and wildlife program to "complement" existing Federal, State and Indian activities. The program must also meet certain specified criteria which include that it "be based on, and supported by, the best scientific knowledge," utilize the most effective means with the minimum cost, be consistent with the legal rights of Indian Tribes, and must specifically address the needs for "improved survival" of anadromous fish in the Columbia River system. *Id.; see also* § 839g(e) ("savings" provision for tribal rights).[23]

Sections 839c and 839f give the BPA the authority to enter into contracts for the sale of power to public bodies, cooperatives and "direct service industrial" (DSI) customers.[24] The BPA establishes rates to ensure they cover costs, § 839e(b)(1), (c)(2), but may negotiate discount rates with certain industrial customers. § 839e(d); *See e.g. Portland General Elec. Co. v. Johnson,* 754 F.2d 1475 (9th Cir.1985) (discussing special rates negotiated with aluminum companies). BPA rate schedules are subject to the approval of the Federal Energy Regulatory Commission (FERC). *CP Nat. Corp. v. Jura,* 876 F.2d 745, 747 (9th Cir.1989). Actions challenging rates, the constitutionality of the Act, or the implementation of any final action taken pursuant to the Act, must be filed in the United States Court of Appeals for the region.

§ 839f(e)(5); *see e.g. Pacific Power and Light v. Bonneville Power Admin.,* 795 F.2d 810, 814 (9th Cir.1986). Actions claiming breach of contractual provisions by the BPA that exceed $10,000 arise under the exclusive jurisdiction of the U.S. Claims Court via the Tucker Act, 28 U.S.C. §§ 1346(a)(1), 1491. *See e.g., Public Utility Dist. No. 1 v. Johnson,* 855 F.2d 647, 650 (9th Cir.1988). District courts retain jurisdiction over all other actions "taken pursuant to the Act by agencies other than BPA or the Northwest Power Planning Council." *PP & L,* 795 F.2d at 814. However, the Ninth Circuit approaches the jurisdictional question with a "broad view" of its own jurisdiction while narrowly defining district court review. *Id.* The court noted that its exclusive jurisdiction over claims arising under the Act reflects Congress' intent to expedite litigation and prevent district courts in different states from rendering potentially conflicting decisions. *Id.,* at 815.

The primary source of electric power marketed by the BPA is hydropower generated by dams in the Columbia River Basin. Stipulated Fact # 54. The DSIs provide approximately 30% of BPA's income, and one-quarter of their electric power load is "interruptable" under "contingent service agreements." Thus, if the BPA restricts that top quartile power supply, the DSIs must either restrict operations or purchase from other, more expensive sources. Stipulated Facts # 6 & 7. PNGC's members are residential, small commercial and agricultural customers who purchase all or substantially all of their wholesale power from the BPA under long term power sale contracts. Stipulated Facts # 18 & 19. PPC is a preference customer under 16 U.S.C. § 832, and its member utilities provide approximately 43% of the BPA's total annual revenues under long term power contracts. Stipulated Facts # 25, 27 & 29. The BPA is the sole source of power for most

**23.** One commentator has observed that by reserving tribal rights under the Act, Congress "implicitly" reserved water rights for fish preservation. Allen Sanders, *The Northwest Power Act and Reserved Tribal Rights,* 58 Wash.L.Rev. 357 (1983). Columbia River Indian tribes certainly have petitioned the Power Planning Council for increased water budgets. Michael Blumm, *The Northwest's Hydroelectric Heritage: Prologue to the Pacific Northwest Electric Power Planning and Conservation Act,* 58 Wash.L.Rev. 175, 235 n. 347 (1983).

**24.** *See* Roger Mellem, *Darkness to Dawn? Generating and Conserving Electricity in the Pacific Northwest: A Primer on the Northwest Power Act,* 58 Wash.L.Rev. 245, 247–258 (1983).

of PPC's member utilities. Stipulated Facts # 30 & 32.

## III. The Complaints

Overview

Plaintiffs' claims under the ESA are primarily directed against three specific agency actions: (1) the April 10, 1992 Biological Opinion issued by the NMFS concerning 1992 Federal Columbia River Power System (FCRPS)[25] operations; (2) the May 1, 1992 Biological Opinion, "no jeopardy" finding and the incidental take statement for Pacific Ocean fisheries; and (3) the June 12, 1992 biological opinion, "no jeopardy" finding and the incidental take statement for 1992 CRFMP summer and fall season fisheries in the mainstem Columbia, Zones 1–5.

Although the complaints raise similar issues, each plaintiff contends it holds a unique position vis-a-vis the defendants and the challenged agency activity. Thus, the following is a brief summary of the plaintiffs, their claims, and their prayers for relief.

### 1. Pacific Northwest Generating Coop. v. NMFS, et al.

Plaintiff PNGC is a generation and transmission power cooperative for 29 rural electric cooperatives. PNGC filed this action against the Secretary of Commerce, the NMFS, PFMC, NPFMC, the Bureau of Land Management (BLM), FWS, FS, BOR, COE and the BPA. PNGC claims that the NMFS violated the Endangered Species Act on April 10, 1992 when it issued a biological opinion concerning the 1992 operation of the FCRPS because it failed to "conduct consultations under § 7 of the ESA in a comprehensive manner." PNGC contends the NMFS should have considered the impact of proposed actions on the entire life cycle of the listed species "as well as hydropower operations." As a result, PNGC claims that the NMFS "arbitrarily and capriciously" violated § 7 by imposing requirements upon hydroelectric power operations without *also* imposing requirements upon other factors affecting the listed species—harvest, habitat and hatchery management—in the same

April 10 opinion, or in any subsequent biological opinions or assessments. PNGC agrees that the NMFS has engaged in *consultations* with the FS regarding *some* habitat activities that may affect the salmon. PNGC claims, however, that there are numerous habitat activities authorized by the FS and BLM and hatchery operations authorized by the FWS and the COE, which have not undergone § 7 consultations with the NMFS, nor has NMFS issued any biological opinions regarding these habitat and hatchery operations. Complaint, para. 23–24, 30.

In addition, PNGC contends that NMFS did not correctly apply its "environmental baseline" standard in its ESA § 7 consultations and failed to use the best scientific and commercial data available. PNGC contends that the NMFS' decision to augment flows and spills was motivated by a desire to rebuild a *commercial* salmon harvest and went far beyond the ESA's goal of ensuring "survival" of the listed species. Specifically, PNGC challenges the NMFS' conclusion that increased flows have a beneficial impact upon the listed species' juvenile mortality rate. Further, PNGC argues that the NMFS failed to adequately consider the effects of voluntary measures already instituted by the BPA, COE and BOR (such as transportation and predator control programs) before requiring augmented flows and spill modifications.

PNGC sets forth 7 claims for relief: (I–VI) Violations of § 7 of the ESA (as described above); and (VII) Violations of the Administrative Procedures Act (APA) by all defendants. PNGC seeks a declaration that conditions imposed upon 1992 FCRPS operations in the April 1992 incidental take statements are invalid. PNGC also seeks a declaration that any harvest or hatchery activities which affect the listed species' habitat and which are undertaken prior to § 7 consultations, biological assessments and incidental take permits, are unlawful. In addition, PNGC seeks an injunction against the imposition of the April 10 restrictions and implementation of any future "unnecessary and imprudent" ESA regulations on FCRPS operations until

---

**25.** The FCRPS includes approximately 30 federal dams which produce more than 80% of the region's electricity. The system operates under a contractual agreement between the Corps of Engineers, the BPA and public and private utilities. Wilkinson & Conner, p. 40, n. 124.

the NMFS determines that such measures are biologically effective, based upon the best scientific and commercial data available and "impose the minimum costs among available alternative measures." [26]

### 2. *Aluminum Co., et al. v. NMFS, et al.*

Plaintiffs in this action are various metal corporations collectively known as Direct Service Industries (DSIs).[27] DSIs filed their action against the Secretary of Commerce, the U.S. Dept. of Commerce, NMFS, PFMC, NPFMC, FWS, BLM, FS, BPA and the COE. DSIs set forth 17 claims for relief under §§ 7, 9 & 10 of the ESA and the APA. Generally, DSIs claim that defendants violated the ESA by permitting harvest, habitat, and hatchery activities to proceed without adequate and coordinated § 7 consultations.

DSIs' claims relating to harvest issues allege that the May 1 and June 12 biological opinions and incidental take statements violate the ESA. DSIs contend the May 1 opinion and incidental take statement are invalid because they fail to impose significant limitations on the ocean fisheries, fail to include consultations with the NPFMC regarding impacts of fishing off the coast of Alaska, and reach a "no jeopardy" conclusion without knowing the exact impact upon the listed species. DSIs allege that the June 12 opinion and incidental take statement are not based on the best scientific and commercial evidence available because they reached a "no jeopardy" finding with respect to summer and fall mainstem fisheries without knowing the extent of the takings involved, and by assuming that catches would be less than amounts authorized under the CRFMP.

As to both opinions and incidental take statements, DSIs claim that the NMFS has engaged in an "improper practice" by evaluating harvests in a "piecemeal" fashion and that the agency has favored harvest interests over protection of the listed species.[28] Further, DSIs claim that the incidental take statements are illegal because authorization of a harvest in a mixed stock fishery is not "incidental" to an otherwise lawful activity (counts III, V, IX, X and XII).[29] DSIs do not contend that any portion of the biological opinions or incidental take statements which address commercial or C & S tribal fishing seasons violate the ESA.

As to issues related to salmon habitat, plaintiffs contend that the FS and BLM have authorized grazing, logging, road building and recreational activities in areas which may affect salmon spawning grounds, without first making biological assessments and consulting with the NMFS. DSIs also contend that the FWS and the COE have failed to adequately protect the listed species by authorizing, funding and operating salmon and steelhead hatcheries in the Columbia River basin without first consulting with the NMFS.

Plaintiffs seek a declaration that the incidental take statements issued on May 1 and June 12 violate ESA §§ 7 & 9 and that all habitat and hatchery activities are unlawful unless and until the federal agencies complete § 7 consultations. Plaintiffs also seek an injunction against all habitat and hatchery activity until § 7 consultations are complete, and against all harvests "directed at the *Oncorhynchus tshawytscha* and *Oncorhynchus*

---

26. The standard of review of a biological opinion issued under § 7 of the ESA is whether the agency's preparation of the opinion was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706. Thus, an opinion should be upheld *if* the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 982 (9th Cir.1985).

27. DSIs' member plaintiffs are the Aluminum Company of America, Columbia Aluminum Corporation, Elf Atochem North America, Columbia Falls Aluminum Company, Intalco Aluminum Corporation, Kaiser Aluminum & Chemical Corporation, Northwest Aluminum Company, Ore-

gon Metallurgical Corporation, Reynolds Metals Company and Vanalco, Inc.

28. The DSIs claim that the NMFS has been "unable to reconcile its dual roles of protecting the listed species and fostering harvest," and that its lenient stance toward commercial fisheries is "amply demonstrated by the manner and timing of NMFS's § 7 consultations on harvest as opposed to river operations." However, the parties have stipulated that defendants may implement regulations designed to "result in an increase in the number of adults of the species." Stipulated Fact # 53.

29. DSIs motion for partial summary judgment relates to these counts only.

*nerka*" and all "other harvests which may incidentally take those species, until they have completed § 7 consultation."[30]

### 3. *Public Power Council v. NMFS, et al.*

PPC is a non-profit corporation which represents 114 consumer owned electrical utilities located throughout the Pacific Northwest. PPC filed this action against the Secretary of Commerce, the U.S. Dept. of Commerce, NMFS, PFMC, NPFMC, FWS, BLM, FS, the BPA and the COE. PPC's thirteen claims closely mirror that of the DSIs in that PPC challenges the May 1 and June 12 biological opinions and incidental take statements on grounds that they violate § 7 of the ESA and the APA. Both PPC and the DSIs argue that the NMFS has acted arbitrarily and capriciously by relying upon "piecemeal" analysis of harvests, by failing to adopt a "comprehensive approach" to consider harvests in light of the combined impacts of habitat, hatchery and hydropower operations, and by failing to rely upon the "best scientific and commercial data available." PPC adds an additional claim that the June 12 incidental take statement fails to include reasonable and prudent mitigation measures. PPC's complaint also differs from DSIs in that it raises no claim directly under § 9 of the ESA.

PPC seeks a declaration the defendants violated § 7 of the ESA by: (1) failing to consider cumulative effects of in-river and ocean commercial fishing; (2) formulating biological opinions without the best scientific data available; (3) issuing incidental take statements which failed to specify: (a) the exact number of listed species expected to be harvested, (b) reasonable and prudent measures, and (c) mitigation provisions; (4) issuing incidental take permits for direct takings and subsequent commerce; and (5) failing to consider cumulative effects of habitat, hatchery and hydro operations. PPC seeks an injunction requiring defendants to conduct

comprehensive consultations and, like the DSIs, seeks an order prohibiting defendants from approving any harvest activity "directed at" chinook or sockeye, and halting all "other" harvest activity pending completion of adequate § 7 consultations.

During oral argument on the parties' cross motions for summary judgment, the DSIs and PPC withdrew their claims against the June 30, 1992 opinion which addressed only tribal commercial and C & S fisheries. Thus, the DSIs and PPC challenge the May 1, and June 12, 1992 biological opinions and incidental take statements insofar as they permit ocean and in-river Zone 1–5 non-tribal commercial and sport fishing and challenge defendants' failure to conduct consultations with the NPFMC on ocean harvests off the coast of Alaska. Plaintiff PNGC challenges *only* the April 10, 1992 biological opinion regarding hydropower operations. In addition to their specific claims against harvest activities, each of the plaintiffs challenge generally the defendants' failure to conduct "comprehensive consultations" within and among the four highlighted areas affecting salmon mortality: harvest, habitat, hatcheries and hydropower.

The biological opinions challenged in these cases address a number of technical issues related to harvest and hydropower management. To fully understand plaintiffs' objections to the validity of these opinions, the following is a brief summary description of the four biological opinions issued during 1992 relating to FCRPS operations and PFMC ocean and CRFMP in-river harvests.

### (1) *The April 10, 1992 Biological Opinion* (Hydropower)

The April 10 opinion was issued by the NMFS as its § 7 ESA Consultation with the COE, BPA and BOR concerning the 1992 operation of the FCRPS and the projected impact of Columbia River hydropower operations upon the listed salmon species.[31] In

---

30. I quoted plaintiffs' prayer because the phrasing raises a question in my mind about exactly why they've crafted their prayer this way—the listed species are distinct population *stocks* of the *O. tshawytscha* (chinook) and *O. nerka* (sockeye). There is no dispute that there are no harvests "directed at" the listed *stocks* of these populations, and I don't know what plaintiffs mean by "other harvests" since the only harvests refer-

enced in the complaint relate to mixed stock salmon fisheries. Thus, as drafted, plaintiffs apparently seek a *complete* and permanent injunction against all non-tribal mixed stock salmon harvests, and a conditional injunction against all "other harvests," which I assume could include steelhead, sturgeon, etc.

31. *At the time this opinion was issued, only the* Snake River sockeye had been listed as endan-

the cover letter to this document, the NMFS Administrator, William Fox, explains that the opinion "covers 1992 FCRPS operations only," and is intended to act as an "interim approach on consultations" pending completion of the "recovery plan" in 1993. Annual planning takes place under the Pacific Northwest Coordination Agreement (PNCA) with the participation of the BOR, BPA, COE and "major northwest generating utilities."

The April 10 opinion is responsive to biological assessments (BAs) issued by the COE and the BPA in January of 1992. The initial BA issued by the COE on January 9, 1992 contemplates increased velocities in the Snake and Columbia River reservoirs as part of a Fish Passage Plan for 1992.[32] The interim goal outlined by the NMFS is to focus upon "decreasing mortality [from percentage baseline levels] rather than increased survival because it is most consistent with the definition of 'take' in the ESA."[33] The opinion identified eight categories of proposed mitigative actions including flow augmentation, predator control efforts, increased spill at Ice Harbor and Lower Monumental Dams,[34] increased law enforcement (to reduce illegal harvests), biological monitoring, completion of and extended seasonal operation of bypass facilities, and continuing the program to transport juveniles downstream by truck and barge.

Although the opinion proposes several modifications to 1992 FCRPS operations, it is the opinion's "flow augmentation" proposal which generates the present controversy with PNGC. The report notes that operation of the FCRPS is "a significant factor causing the decline of all three listed and proposed species," and concluded that "therefore, baseline operation of the FCRPS is likely to jeopardize the continued existence of these species." The opinion reasons that juvenile salmon are affected by decreased river flows because it slows their passage through reservoirs. Theoretically, slow passage increases juvenile exposure to predation and disease (from higher temperatures[35]) in the reservoirs. Slow passage downstream may cause "residualism," that is it may affect delicate timing required for smoltification since the juvenile must get from fresh water to salt water within a relatively small window during its spring life, or face losing its ability to migrate to the ocean. If the juvenile goes beyond its smoltification window without having reached salt water, it becomes a resident of the reservoir and vulnerable to prolonged exposure to disease and predation.

Thus, the opinion concludes that drawing down reservoirs to increase water velocity and decrease travel time for juvenile migrants along with monitoring and evaluation of water conditions could "possibly" reduce juvenile mortality. The report cautions that "no existing studies provide empirical evidence establishing a relationship between juvenile fall chinook salmon survival and travel time," and that the proposed action was expected to have "little effect" on adults. The opinion contains additional caveats that the effects of many of its proposed actions are "not quantifiable," and notes concerns about the precision of certain underlying assumptions in analyzing data collection and projections.

gered. However, the opinion anticipates that the spring/summer and fall chinook will also be listed as threatened.

**32.** Flow amendments were anticipated for the Brownlee Reservoir for the April 15–June 15 period, and increased discharges were anticipated from the Dworshak Reservoir during the June 16—August 30th period to augment flows during the juvenile and adult migration period. April 10 Bio Op., at 5.

**33.** The "environmental baseline" includes past and present impacts of all Federal, State and private actions and anticipated impacts of all proposed Federal projects that have already undergone § 7 consultations and state and private actions which are contemporaneous with the consultation in process. 50 CFR § 402.02. The baseline used in the April opinion is comprised of data from 1986 to 1990.

**34.** Passing additional water over spillways is intended to be an interim measure to protect juvenile downstream migrants until permanent bypass facilities are installed. NMFS, June 1991 Report.

**35.** The ideal fresh water temperature for most salmon is about 55 degrees fahrenheit, although they can survive within a range of near 32 to 77 degrees. Steelquist, *Field Guide*, at 26; and P.A. Olson and R.F. Foster, *Temperature Tolerance of Eggs and Young of Columbia River Chinook Salmon*, 203 (Trans.Amer.Fish.Soc., 1955).

The NMFS concluded that the 1992 operating plan represented progress towards reducing mortality rates of listed species and thus, the 1992 FCRPS actions "are not likely to jeopardize the continued existence" of the listed species. In addition, NMFS recommended further coordinated evaluation, management and research. Section XI of the opinion is the "incidental take" statement and list of "reasonable and prudent measures and terms and conditions for implementation" under § 7(b)(4) of the ESA, recognizing that operation of the FCRPS in 1992 "is expected to result in the incidental take" of an unknown number of listed salmon species. However, the statement estimates that if all reasonable and prudent measures are implemented, the "incidental" take of listed stocks should not exceed 69% for juvenile and less than 18% for adult sockeye, 68–71% for juvenile and less than 35% for adult spring/summer chinook, and 82% of juvenile and less than 66% of adult Snake River fall chinook salmon.

On April 10, 1992, the COE issued a "Record of Decision" indicating its intent to comply with the terms listed in the NMFS' April 10 incidental take statement. Both the COE and BOR are conducting dam operations in accordance with the terms and conditions set forth by the NMFS.

(2) *The May 1, 1992 Biological Opinion* (Ocean Fisheries)

The May 1 opinion was issued by the NMFS pursuant to § 7 of the ESA following consultation with the PFMC regarding the effect of the 1992 Fishery Management Plan (FMP) for ocean "mixed stock"[36] salmon fisheries off the coasts of Washington, Oregon and California on the listed Snake River salmon species. The opinion relies upon the biological assessment (BA) provided by the Salmon Technical Team (STT) of the PFMC as well as available information from scientific literature and biologists. Like the April 10th opinion, the May 1st opinion cautions that the consultations cover only 1992 and represent an "interim" approach designed to "reduce the decline" of the listed species.

The May 1 opinion notes that based upon historical data, run sizes, and gear restrictions, the possibility of a harvest of Snake River sockeye in the PFMC area is "almost nil."[37] The May 1 opinion also recognizes that while the availability of data is limited, migration and timing patterns of spring chinook and rough projections from coded wire tag (CWT) recoveries lead to estimation that less than 1% of the spring chinook are harvested in the ocean fisheries and that any impact on summer chinook would be "extremely small."[38]

The most substantial impact that ocean fisheries have on listed species is on the Snake River fall chinook. Analysis of the impacts on Snake River fall chinook was based upon a recently developed microcomputer-based chinook model which relies upon estimates of abundance, exploitation rates (which vary by management form—i.e., either quotas or estimates from fisheries with time/area restrictions) distribution, age structure and maturation rates. Although precise numbers of the Snake River fall chinook catch were not known, the NMFS concluded that, based upon the proposed 1992 management regime, the incidental take of Snake River fall chinook would be 40% lower during the 1992 season than it was during the 1986–1990 base period.

36. The term "stock" refers to an "isolated reproductive unit" that shares a common environment and gene pool and is identified with a specific season and watershed stream. Thus a "mixed stock" salmon fishery could include Columbia and Snake River spring, summer and fall "substocks." Wilkinson & Conner, at pp. 24–25 n. 33.

37. Unlike the spring/summer and fall chinook whose location can be estimated based upon timing of the seasons, currently there is no specific information available on the timing of the Snake River sockeye.

38. CWTs are millimeter sized binary tags which contain historical information about a fish's life span, hatchery of origin or tributary of origin. They are placed into the snouts of hatchery smolts and the small adipose fin near the tail of the fish is clipped. Fish and Game officers then look for the missing adipose fin when they inspect catches—once found, the officer trims off the snout of the fish and the CWT is recovered and decoded. Information from CWTs is then used to base estimates of run and stock sizes and migrations.

Based upon its estimation that PFMC ocean fisheries would have little to no impact upon the sockeye or spring/summer chinook and that the exploitation rate for fall chinook would decrease 40% consistent with the interim goal of "decreasing mortality," the NMFS concluded that the proposed 1992 Pacific Ocean FMP was "not likely to jeopardize" the listed species. An incidental take statement pursuant to § 7(b)(4) is attached. Included within the opinion are conservation recommendations to the PFMC to develop better estimates of ocean distribution and abundance of listed species and to continue to work to develop an integrated "Life Cycle Model" to analyze impacts of all aspects affecting a salmon's life throughout its entire life span, to continue monitoring impacts and to include endangered species impacts in management planning criteria.

### (3) *The June 12, 1992 Biological Opinion* (In–River Fisheries)

The June 12 opinion was issued by the NMFS pursuant to § 7 consultations with the FWS and the BIA regarding impacts on the listed species of the 1992 summer and fall season fisheries conducted under guidance from the Columbia River Fishery Management Plan (CRFMP) in "Zones 1–5," which comprise the mainstem Columbia River below Bonneville Dam.[39] In addition, the opinion addresses potential impacts on the listed species from tribal C & S gillnet and platform fisheries in Zone 6, between Bonneville and McNary dams.

In the June 12th opinion, NMFS reiterates the same warnings raised in the April and May 1992 biological opinions that it was developed as an "interim" approach for 1992 actions only and that its present goal is to reduce mortality rates. Also, like the May 1 opinion, the NMFS relied extensively upon a biological assessment prepared by TAC, the CRFMP subcommittee, "with" the FWS.[40] As with the prior opinions, the June 12th

opinion anticipates future "comprehensive plans for recovery." The NMFS also notes that it considers ocean harvests (addressed in the May 1 opinion) and hydroelectric operations (addressed in the April 10 opinion) in assessing impacts of in-river fishing activities on the listed species, so its approach is more comprehensive than the prior two. However, NMFS also notes that it does not consider future federal actions including ongoing hydroelectric operations, and habitat conservation, but that these actions are being reviewed "through separate consultation processes." June 12 Opinion, at 18.

While recognizing that any catch of a Snake River sockeye could jeopardize the species, the NMFS calculated the following probabilities of a Snake River sockeye catch: (1) .39 for tribal C & S fisheries in Zone 6 (based upon a hypergeometric distribution and a low estimated run size of 50,000 Columbia River sockeye and a total catch of 3,000);[41] (2) .002 for lower river commercial shad and recreational steelhead fisheries; (3) .01 for mainstem recreational fisheries; and (4) .01 for lower river fall season commercial salmon fisheries (with no recorded landings of sockeye since 1983).

Potential catches of spring and summer chinook were analyzed by a percentage of anticipated take. In light of an estimated increase in spring chinook run sizes due to intentional restrictions in lower river recreational and commercial fisheries and the elimination of tribal Zone 6 commercial summer sockeye fishery, the opinion estimates that, although raw numbers are expected to increase, the 1992 planned harvest represents an overall 25.7% lower harvest rate of spring chinook than that of the base period (1986–1990). The rate of harvest for summer chinook was up over prior years and based upon the depressed status of the summer chinook, the CRFMP had already instituted harvest limits of summer stocks to mainstem

---

**39.** The "summer season" takes place from June 1—July 31, and the "fall season" commences August 1 and extends through the end of the year. Fisheries specifically referenced in the opinion include lower river commercial gillnet, mainstem sport, and a Washington sturgeon tagging project.

**40.** As explained in William Shake's deposition, an FWS representative is a member of the TAC

and FWS' participation in the preparation and review of the BA was limited to participation within the subcommittee.

**41.** The opinion notes that this figure could be lower than anticipated given low stream flow predictions for 1992 since the fish tend to migrate toward the center of the river, reducing the probability of a catch from platform fishing.

Indian C & S platforms, incidental catch in Indian gillnet (targeting sockeye, steelhead and shad) with a 5% cap, and incidental catch in non-Indian mainstem fisheries (directed at sockeye and shad) with a 5% cap.[42]

The June 12 opinion includes estimates of a harvest of approximately 88 summer chinook from tribal C & S fisheries, 7 spring/summer chinook from the commercial shad fishery, 10 summer chinook from mainstem recreational fisheries, and up to 5 could be lost from handling during Washington's sturgeon research and tagging project. Upriver fall chinook estimates were up 5,000 to 45,000 beyond McNary Dam based upon the CRFMP management plan to increase escapement goals in 1992. Anticipated harvest rate on Snake River fall chinook was estimated at 74.7% below the base period rate.

Based upon anticipated harvests and improvements in mortality rates, the NMFS concluded that the 1992 CRFMP proposal met its interim goal of reducing mortality and "reversing the decline in abundance," and thus, was "not likely to jeopardize the continued existence" of the listed species. The opinion also provides conservation recommendations including improvements in data collection, forecast methodologies, monitoring, production strategies and amending management criteria to more specifically account for the needs of the listed species. The incidental take statement covers CRFMP 1992 operations and anticipates an incidental take of spring/summer chinook and Snake River fall chinook. A decision on the impacts on the Snake River sockeye was deferred. The "Reasonable and Prudent Measures" section reiterates the need for improved in-season monitoring and possible re-initiation of agency § 7 consultations if incidental take exceeds specified levels.

(4) *The June 30, 1992 Biological Opinion*

The June 30 opinion is the addendum issued by NMFS to further address potential impacts on the Snake River sockeye from tribal Zone 6 C & S platform and fall season

commercial fisheries. Additional consultations with the tribes and other CRFMP parties following the June 12 opinion resulted in a "no jeopardy" finding for the Snake River sockeye with an incidental take permit for no more than 3.1% total sockeye harvest in Zone 6 (an estimated harvest of 1,500 sockeye, down from 3,000 in 1991) with a .22 probability of harvest of a listed species. The reduced harvest expectations were due to substantially lower flows in 1992 and the tribes' voluntary decisions to close platform fishing on Sundays and forgo their summer C & S gillnet fishing season. Conservation recommendations included further voluntary reductions in sockeye harvest (below 3.1%), possible re-initiation of agency § 7 consultation and a shift in the focus of management planning from allowable harvest rate to "acceptable risk associated with minimized incidental take."

### IV.  Motions & The Participants

a.  Defendants' Motions

Defendants now move for summary judgment against all three complaints on four alternative bases: (1) standing; (2) mootness; (3) unripeness; and (4) failure to join necessary and indispensable parties—that is the Indian Tribes who exercise treaty fishing rights in the *Columbia River and Ocean fisheries*.

b.  Plaintiffs' Motions

DSIs move for partial summary judgment on a single *legal* argument that defendants violated § 9 of the ESA by issuing "incidental take" permits for commercial ocean and in-river harvests (in Zones 1–5), since the authorization constituted a *direct* take of endangered species and also resulted in the unlawful trade and transport in commerce of endangered species. I emphasize that this is a *legal* argument, because the DSIs do not premise it upon any specific factors relative to the 1992 incidental take permits, nor do they present any *direct* evidence that endangered species have actually been taken and traded in commerce.[43] For the purposes of

---

42.  Ongoing consultations with the tribes and other members of the CRFMP regarding future mitigation efforts with respect to the 5% harvest limit and increased monitoring are addressed in the June 30 addendum.

43.  Plaintiffs do come forward with affidavits from experts, such as Richard Turner and Gilbert Silvia, that conclude that species must have been taken during the 1992 commercial harvest.

these motions, I have assumed plaintiffs' contentions are true. The DSIs' position is an all or nothing argument that, since there can *never* be an "incidental" take of a listed species from a commercial mixed stock harvest, the taking can only be "direct" and, hence, in violation of § 9.

Plaintiff Public Power Council (PPC) has filed a similar motion for partial summary judgment alleging that the "takes" authorized on May 1, and June 12 were direct rather than "incidental." During oral argument, PPC withdrew that portion of its motion which is directed against the June 30 opinion and incidental take statement (which relate only to Zone 6 tribal fisheries) and those *portions* of the June 12 opinion and incidental take statement which relate to tribal Zone 6 fisheries. However, unlike the DSIs, PPC also seeks summary judgment on the basis that the incidental take statements violate ESA § 7 because they fail to: (1) specify the *amount* of the take (impacts); (2) include minimization measures; and (3) include consultation on Alaskan harvests.

PNGC has *not* filed a similar motion for partial summary judgment against the incidental take statement issued with respect to 1992 FCRPS hydropower operations. However, it has filed an opposition to defendants' motion for summary judgment.[44]

### c. Amicus & Intervenors

Amicus participants Nez Perce, Warm Springs, Quinault, Makah, Yakima, and Umatilla Tribes jointly filed memoranda in support of defendants' motions for summary judgment in each case, and against the DSIs' and PPC's motions for partial summary judgment. The State of Washington, a defendant-intervenor, has filed opposition to the DSIs' and PPC's motions for partial summary judgment which essentially echo federal defendants' position regarding the "inci-

dental" take issue. The State of Oregon, a defendant-intervenor, has filed its own motions for summary judgment in each case on grounds which mirror and augment claims raised by federal defendants.

Intervenor Salmon-for-All filed opposition to DSI and PPC plaintiffs' motions for partial summary judgment, joining in opposition filed by federal defendants and the amicus treaty tribes. I received no response from amicus Idaho Department of Fish & Game, or intervenor Coalition for Idaho Water.

Intervenors in the *PNGC* case, Civ. 92–973–MA, Northwest Resource Information Center (NRIC), et al., filed a brief joining in the federal defendants' motion for summary judgment *only* on the basis that PNGC lacks standing.[45] Although the remainder of NRIC's brief also raised issues relative to their members' own standing to proceed with their cross-complaint, during the hearing on summary judgment I informed the parties that I would not consider the merits of NRIC's cross-complaint, since there is currently no motion pending against it. I do note, however, that NRIC's cross-complaint differs from PNGC's complaint in at least two potentially significant respects. First, NRIC contends that the flows are *insufficient* to protect the species. Second, NRIC's basic attack is directed against the NMFS' year-by-year approach to FCRPS operations and its failure to make a comprehensive impact analysis over *time* (as opposed to PNGC's complaint that the NMFS failed to consider comprehensive impacts).[46]

## V. Discussion

### 1. Standing

Plaintiff PNGC claims an immediate interest in the Columbia and Snake River fish and water management via the impact of BPA's

---

44. Originally, there was a fourth related action against the same defendants, Civ. 92–1119–MA, which was voluntarily dismissed on January 19, 1993. Plaintiffs in that case included the Columbia Snake River Irrigators Association, the Port of Whitman County, the Port of Clarkston, Oregon Cattlemen's Association and Northwest Irrigation Utilities.

45. In fact, NRIC takes "no position" regarding PNGC's joinder of parties.

46. In addition, I note that two other actions have been filed in this district subsequent to the complaints in this case claiming that the Forest Service failed to protect listed species in its management of specific habitat areas. *See e.g. Pacific Rivers Council, et al. v. Robertson*, Civ. 92–1322–MA (claiming Forest Service violated the ESA by failing to consult on impacts of land management plans in Wallowa–Whitman and Umatilla Forests on Snake River chinook).

decisions about water flow and the corresponding rate increases. Specifically, plaintiff claims that, "as direct purchasers of BPA electric power" its members "bear a substantial portion of increased costs" which result from conservation measures taken for the listed species.[47] These conservation measures include river operations (water flow restrictions) as well as BPA's participation in and funding of hatchery and other conservation programs. Plaintiff PNGC also premises standing upon an "informational" interest in accurate and complete endangered species data for use in the FCRPS process.

DSI plaintiffs claim an immediate interest in the listed species because: (1) they employ biologists and geneticists who actively participated with the NMFS throughout the process which led to the listings; (2) they participated in the "Salmon Summit" and its efforts to develop a recovery plan for the listed species; (3) they have paid approximately one-third of the BPA's costs attributable to conservation measures[48] over the last ten years through increased costs of hydroelectric power; (4) they expect future "double digit" power rate increases, of which, 4% is attributable to the "effects of the listed species;" and (5) their businesses depend upon a stable and predictable power supply. The declaration of Steve Waddington, Deputy Director of DSI, Inc., and exhibits attached thereto, demonstrate that the DSIs have actively participated in research efforts and have contributed information and recommendations on habitat measures to the NMFS.

Like PNGC and the DSIs, PPC claims an immediate interest in the Columbia and Snake River fish and water management based upon the impact of BPA's decisions about water flow, corresponding rate increases, participation in planning through the Northwest Power Planning Council and the

Salmon Summit, and its desire to maintain a "stable, predictable and economical" power supply from the FCRPS. See, Declaration of William K. Drummond. However, PPC also contends that its interest in this litigation is "unique" because its members enjoy a statutory preference and priority in BPA's sales of electricity under the Bonneville Project Act, 16 U.S.C. § 832c(a), PPC participates in BPA's rate making proceedings, and because its members are governed by "publicly" elected boards so that it most closely represents the interests of the ultimate consumers and bearers of the increased cost burden.

Section 11 of the ESA, 16 U.S.C. § 1540(g), provides that "any person" may maintain an action against another person, or against a government entity, for violations of the ESA and that original jurisdiction lies with district courts. The ESA broadly defines "person" to include any "individual, corporation, partnership, trust, association or any other private entity," or government or municipal entity. § 1532(13) (1988).

■ Given the breadth of the ESA's citizen suit provision, plaintiffs seeking to invoke federal jurisdiction under the ESA need only satisfy the following "irreducible" minimum Article III requirements:[49] (1) an "injury in fact—an invasion of a legally protected interest which is concrete and particularized . . . and actual or imminent, not conjectural or hypothetical;" (2) a causal connection—that the injury is "fairly traceable to the challenged action" and (3) the injury is likely to be redressed by the relief sought and not merely speculative. Lujan v. Defenders of Wildlife, —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) ("Defenders"); Beck v. U.S. Department of Interior, 982 F.2d 1332, 1337–38 (9th Cir.1992). As Justice Scalia explained, Article III's "cases and

---

**47.** PNGC submitted affidavits from ten of its members who are farmers and ranchers who indicate that they enjoy observing salmon and being able to buy power at reasonable rates.

**48.** These costs include research funding and hatcheries.

**49.** In Lujan v. Defenders of Wildlife, —— U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) the Supreme Court's analysis of standing to support an ESA claim was limited to the application of

only Article III requirements. Compare Lujan v. National Wildlife Federation, 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990) (applying 'zone of interests' test to NEPA–FLMPA/APA claims). Whether the "zone of interests" prudential limitation from APA standing requirements adds an extra element to standing principles applicable to ESA claims is not an issue I need to address in these cases for the reasons set forth in Allied Signal, Inc. v. Lujan, 736 F.Supp. 1558, 1560 n. 3 (N.D.Cal.1990).

controversies" limitation on judicial power is the "central mechanism" for the basic separation of judicial, legislative and executive power. *Defenders*, —— U.S. at ——, 112 S.Ct. at 2136.

■ When a claimant's challenge against agency action or inaction is premised upon the unlawful regulation or lack of regulation of someone else, standing is "substantially more difficult to establish." *Id.*, at ——, 112 S.Ct. at 2137. Thus, the claimant must come forward with evidence that the third parties will act in such a manner as to cause it a redressible injury. *Id.*[50]

The "standing" requirement has been an actively litigated issue in environmental cases. Most of the cases however, have involved environmental organizations asserting injury to their members' ability to observe and study species. In such cases, the courts have held that affidavits demonstrating that members "derive benefit and enjoyment" from the existence of the listed species are sufficient to satisfy standing to sue for violations of the ESA and the APA. *See e.g. Mt. Graham Red Squirrel*, 986 F.2d at 1581, n. 8, 1582, n. 11 (APA and ESA § 9); *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1517, n. 18 (9th Cir.1992) (NEPA via the APA). However, each of these cases is distinguishable in one significant respect—there is no dispute that the parties' asserted interests were in direct alignment with those of the listed species and directly contrary to the interests of the third parties regulated (or not regulated) by the government agency. Therefore, each case presented an actual *controversy* requiring the court to analyze whether the agency satisfied its duties to the competing interests.

■ Despite the breadth of the ESA's standing provision, a few courts have drawn the line and denied standing. Most of these cases involve challenges to the listing itself.

For example, in *Glover River Organization v. U.S. Dept. of Interior*, 675 F.2d 251 (10th Cir.1982), plaintiff was a non-profit flood control organization which sought to challenge the Interior's listing of a small fish, known as the leopard darter, on grounds that the Secretary should have first prepared an EIS under NEPA. Plaintiff premised standing upon the threat to beneficial proposed dam construction projects and its members interest in avoiding property damage if flood control measures were restricted by the leopard darter's listing. The court found that the flooding potential was a sufficient "injury," for standing purposes, but held that plaintiff failed to adequately demonstrate that its injuries were caused by the defendants' inaction or were likely to be redressed by the relief sought: "[E]ven if the preparation of an EIS should lead to removal of the leopard darter from the threatened species list, this would not ensure the funding or construction of the projects [plaintiff] desires." *Id.*, at 255; *see also Portland Audubon Soc'y v. Hodel*, 866 F.2d 302, 309 (9th Cir.1989) (denying intervention to timber group in NEPA action), *cert. denied*, 492 U.S. 911, 109 S.Ct. 3229, 106 L.Ed.2d 577 (1989);[51] *Starbuck v. City & Cty. of San Francisco*, 556 F.2d 450, 458–9 (9th Cir.1977) (consumer-rate payers lacked standing to challenge agency's use of power facility under Raker Act); *Northern Spotted Owl v. Hodel*, 19 E.L.R. 20275, 20276, 1988 WL 160045 (W.D.Wash.1988) (denying intervention to timber company challenging listing decision under ESA); *Churchill Truck Lines, Inc. v. United States*, 533 F.2d 411, 416 (8th Cir.1976) (common carrier lacked standing to raise NEPA violations against ICC absent allegation of environmental injury).

■ I agree with plaintiffs that there is nothing in the ESA to suggest that an "economic" injury is no less an "injury" than the

---

50. In *Defenders*, members of an environmental organization sought to challenge an Interior regulation that ESA § 7 applied only to actions within the United States or on the high seas, and did not extend to foreign countries. The Supreme Court held that affidavits from members asserting that they might travel to foreign countries sometime in the future failed to satisfy the "actual" or "imminent" injury prong of the Article III test. —— U.S. at ——, 112 S.Ct. at 2138.

51. Although standing and intervention standards are similar under Ninth Circuit jurisprudence, they are not identical since intervention requires only that the party seeking to intervene "assert [not establish] an interest relating to the property transaction," in question. *Portland Audubon*, 866 F.2d at 308, n. 1; *see also Beck*, 982 F.2d at 1338–40 (differentiating party standing from intervenors' standing on appeal).

loss of the ability to view the species in its natural habitat.[52] Plaintiffs have adequately demonstrated that an increase in their power rates is as inevitable as death and taxes and that a portion of that increase will be attributable to endangered species protection measures. Further, there is no dispute that plaintiffs have been active participants in the political and administrative processes that brought about the listings and considered solutions to the salmon's decline. However, Article III contains no similar "standing" restriction for participation in the political process.

■ The "flaw" that I see in plaintiffs' claim to standing for the purposes of judicial review under the ESA is not that their injury is economic in nature nor that they lack any interest in the outcome of salmon mitigation efforts, but rather that, like the flooding injury in *Glover,* even if defendants fully complied with all provisions of the ESA, the causal link between the injury and the asserted ESA violations is attenuated at best. Further, plaintiffs fail to satisfy the "redressible" element since there is nothing to ensure that plaintiffs' rates will go down or that the power supply will become any more stable if defendants fully comply with the ESA and commercial harvesting is shut down completely in the PFMC area and Zones 1–5.

As for causation, plaintiffs' claimed injury of higher power rate and a more unstable supply depend upon several "links," before reaching the ESA. For example, in the habitat area, assuming that plaintiffs could satisfy the level of specificity required for such claims under *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177— thus, the third parties' activity—such as grazing, must actually cause harm to salm-

on's habitat such that the agency has a duty to engage in consultations. Once consultations take place, assuming all other natural factors remain static, there must be some appreciable benefit to the salmon. That appreciable benefit, when combined with all other assumed benefits from comprehensive consultations must be significant enough to cause the listed species to rebound despite the 60–80% losses of juveniles attributable to dam operations, and to such an extent that the COE, BOR and BPA determine that flow augmentation and spill releases are no longer necessary to aid juvenile salmon survival. In light of Justice Scalia's caution that the burden of establishing causation and redressibility for Article III standing is significantly greater when the claimant rests its challenge upon the regulation of third parties, and given the attenuated chain necessary to link plaintiffs' claimed injury with the action of defendants, I find that causation is lacking.

■ As for redressibility, the loss of water for hydropower use and rate increases are only partially attributable to mitigation efforts directed to the listed species.[53] As noted in the Northwest Power Council's 1991 Plan, and as exhibited in the last year, there are a number of stresses that have been placed upon the FCRPS completely unrelated to the listed species including drought conditions—the "worst in 50 years," dramatic population increases, Trojan's closure and federal pressure to step-up Bonneville loan payments.[54] Another significant factor not addressed by the parties includes Canadian salmon fishing currently under re-negotiation in the Pacific Salmon Treaty talks. Thus, even if plaintiffs are correct about each alleged ESA § 7 and 9 violation by defendants,

---

**52.** However, I note that plaintiffs' reliance upon *Portland General Elec. Co. v. Johnson,* 754 F.2d 1475 (9th Cir.1985), in support of its contention that financial injury from increased electric rates justifies "standing," is somewhat misleading in the present context. In *PGE,* plaintiff challenged BPA procedural errors in its reduced rate sales to the DSIs under the NWPA, not the Endangered Species Act. PGE's standing under the NWPA was readily established by its status as a BPA customer. *Id.,* at 1480. *See also California Energy Comm'n v. BPA,* 909 F.2d 1298, 1306–7 (9th Cir.1990) (DSIs' standing to challenge BPA rate formula allocation policy under NWPA), *cert. denied* —— U.S. ——, 111 S.Ct. 1682, 114

L.Ed.2d 77 (1991); and *Fair v. E.P.A.,* 795 F.2d 851, 853–4 (9th Cir.1986) (assessments conferred standing upon residents challenging EPA sewer project); *Cf. Port of Astoria, Oregon v. Hodel,* 595 F.2d 467, 475 (9th Cir.1979) (pecuniary loss alone insufficient for standing).

**53.** For the purposes of these motions, I am assuming that there is a link between harvest reductions and BPA expenditures. Accordingly, plaintiffs' contention that it has been denied adequate discovery on the standing issue is moot.

**54.** Not to mention the current price of aluminum. *See PGE,* 754 F.2d at 1479.

whether or not plaintiffs' claimed injuries from rate increases and power instability could be cured by the relief sought renders the "redressibility" element of standing a weak one, at best.

The redressability flaw in plaintiffs' case for standing is best illustrated when I examine the DSIs' and PPC's requests for injunctive relief to halt all non-tribal commercial fishing in-river and in the PFMC management zone. As the biological opinions noted, only the Snake River fall chinook are appreciably impacted by PFMC ocean and in-river harvests. Snake River sockeye are not caught and the chance of catching a Snake River spring/summer chinook is minimal given timing and area restrictions. However, according to figures compiled by the Columbia River Inter–Tribal Fish Commission in a report dated November 20, 1992,[55] mortality rates of Snake River fall chinook (based upon averages from CWT recoveries between 1988–1990) from harvest activities may be broken down geographically as follows:

(1) Alaskan Ocean Harvest (NPFMC): 5%

(2) Vancouver Island Troll Fishing: 16.1%

(3) Other British Columbia Fishing: 5.6%

(4) U.S. Ocean below the Canadian border (PFMC): 12.6%

(5) In–River Tribal: 20.6%

(6) In–River Non–Tribal: 8%

Inter-dam loss between Bonneville dam and Ice Harbor (the first dam on the Snake River from the Columbia) is 8.4%, leaving a total adult Snake River fall chinook escapement rate of 23.7%. Thus, by enjoining commercial in-river and PFMC harvest we could assume, at best, a 20.6% reduction in adult Snake River fall chinook mortality (assuming tribal harvest does not increase due to an increase in harvestable stock). In light of all of the other factors contributing to the decline of the listed species, I find the impact of singling out PFMC ocean and in-river commercial harvests is simply too tenuous a connection with the lower power rates and power stability sought by plaintiffs.

█ To the extent that plaintiffs rely upon an injury to their ability to "participate" in the endangered species act process, case law provides that this interest does not exist in a vacuum, but must be accompanied by the other Article III elements, discussed *supra.* See *Idaho Conservation League,* 956 F.2d at 1514–1515 (procedural flaw may satisfy injury element of Article III test, assuming other elements met); and *Friends of the Earth v. U.S. Navy,* 841 F.2d 927, 931 (9th Cir.1988). In addition, the fact that plaintiffs can and do participate in the process under the auspices of the Northwest Power Council and because they *can* challenge any species mitigation measures or policies enacted under the NWPA by pursuing a claim with the Ninth Circuit, I find that plaintiffs are not denied a forum for injuries suffered by rate increases.

█ Further, and perhaps more important, plaintiffs' claimed injury to a "legally protected interest" relates to the *water* resource, not the fish. As in *PP & L,* 795 F.2d 810, the fact that plaintiffs have framed their complaints as being under the ESA rather than the NWPA does not end my threshold jurisdictional inquiry. See *also CP Nat. Corp.,* 876 F.2d at 747–748 ("[A] party's characterization of claim is not dispositive of jurisdictional issues"); and *PUD v. Johnson,* 855 F.2d at 649 (courts must focus upon nature of conduct challenged rather than label applied to claim). Plaintiffs' asserted interest in the listed species is, at best, derivative of their interest in the equitable apportionment of the water resource. Further, the source of plaintiffs' legally protected interest in a "stable" and "economic" power supply relies upon provisions within the Northwest Power Act which fall within the exclusive jurisdiction of the Ninth Circuit Court of Appeals pursuant to 16 U.S.C. 839f(e)(5). Whether the inclusion of costs for endangered species protection within the rates is sufficient to tip the scales and render previously "economical" rates into rates that are simply too costly to comport with the NWPA's "economical" rate proviso, is a mat-

55. Although both parties referenced the impact of Alaskan harvests and North Ocean harvests, no actual harvest rates on listed species were provided for any area above the U.S.—Canadian border. This omission prompted me to request assistance from the court's expert, Dr. Howard Horton. Dr. Horton provided the information from the Columbia River Inter–Tribal Fish Commission without comment.

ter first within the jurisdiction of the NWPC, then with the FERC and then with the Ninth Circuit. By congressional mandate, it is *not* a matter within the jurisdiction of a district court. The potential for multistate jurisdictions and inconsistent or irreconcilable results implicated by plaintiffs' challenge fall squarely within the purposes of the appellate review provision of the Power Act.

When I compare plaintiffs' interests to the interests of other participants in this case and other users of the Columbia River System, the conflict becomes clear. The Tribes', non-tribal commercial fishers', and sports fishers' central interest is the fish, and their interests in the water resource relate solely to their interests in ultimately protecting and improving the harvest of genetically superior listed wild stocks.

I draw these distinctions to point out another pragmatic aspect of standing, not directly confronted in prior environmental cases, but which relates to plaintiffs' "injury" which triggered these actions. Like the conflict of interest analysis that I addressed in determining whether to permit NRIC to represent the interests of both environmentalists in this case when it represents harvesters in other cases, the concern that I have with plaintiffs' cases is that, when they invoke the Endangered Species Act and seek to specifically enforce its terms, ultimately they run headlong into a classic conflict of interest— by invoking the ESA they purport to represent the interests of the listed species. Yet, when push comes to shove, if the resources become so scarce that truly hard choices must be made, plaintiffs' asserted interests in the listed species may yield to the basis for their claimed "injury" for standing under the ESA—their interests in power and water for hydroelectric use.

This conflict is not just idle speculation about the future, but is evident from the very face of the complaints as well as plaintiffs'

motions for partial summary judgment. First, although plaintiffs do not exclude hydropower from their request that defendants undertake "comprehensive" consultations— they do not seek amendments to hydropower operations for the benefit of the species. Instead, they seek to have the economic burden placed upon hydropower operations by flow augmentation efforts engrafted onto other ESA consultations by forcing defendants to compare billion dollar increases in hydroelectric rate to the modest amounts recovered by commercial fisherman when they sell salmon to the same customers who ultimately bear the burden of increased hydropower costs.

As the amicus tribes point out, if plaintiffs' ultimate goal was protection of the listed species, and "equitable enforcement" of the ESA, then conspicuously absent is a claim for a reduction in hydroelectric activity or correction of those aspects of the dams which overwhelmingly destroy more juvenile migrants in each of the three listed species than all harvests combined.[56] Finger pointing and dollar comparisons go only a short distance before running headlong into direct comparisons of the "incidental" take caused by harvests versus hydropower. To permit these plaintiffs to proceed with their claims under the ESA, would be akin to permitting a fox to complain that the chickens have not been fed—sure, he has an interest in seeing that the chickens are well fed, but its just not the same interest the farmer has, nor is it an interest shared by the chickens.

In addition, experience has taught us that courts are not particularly well equipped to determine specific complex issues of allocation. In *Sohappy v. Smith*, 302 F.Supp. 899 (D.Or.1969), Judge Belloni held that the Columbia River Tribes were entitled to a "fair share" of the salmon harvest and in *United States v. Washington*, 384 F.Supp. 312 (W.D.Wash.1974), Judge Boldt held that the tribes were entitled to 50% of the harvest.

---

**56.** As for the DSIs' assertion in their response to defendants' motion for summary judgment of the government's "wholesale refusal to enforce the ESA in areas other than hydropower," this ignores the vast number of voluntary reductions and restrictions made by the states and the Tribes long *prior* to the ESA's enactment. In its analysis of the *need* for listing under ESA § 4, the NMFS spent a great deal of time discussing the

inadequacy of the Power Acts to protect the species given the impact of water flow regulations which were either insufficient to start with or which were never fulfilled. In contrast, the NMFS did not identify *current* tribal or commercial harvesting as a basis for the listing decision given these significant voluntary reductions and time restrictions.

Application of these equitable principles however has only been achieved through the coordinated and cooperative efforts of the Tribes, states and commercial fishing interests with limited judicial review for certain "emergencies." *See* CRFMP I.C. The process that has developed from these disputes about salmon harvest allocation demonstrates a fundamental justification for Article III standing requirements—that is, a recognition that certain disputes are best resolved in the political arena, by *experts,* such as the Tribes and the respective State Departments of Fish and Wildlife, rather than a judicial forum by a judge or a panel of judges whose roles are limited to *legal* rather than biological, ecological or economical principles. This same rationale applies with equal, if not greater force to the broader issue of an equitable allocation of the water resource.[57]

Finally, although we are obviously not at a stage where I could or should be considering the underlying merits of plaintiffs' complaints, I *have* reviewed all of the submissions which I found related in large part to scientific disputes about the accuracy of dam passage conversion rates, the benefits of flow augmentation to juvenile migration, and potential impacts of reduced harvest rates on Snake River fall chinook.[58] These include John Stevenson's Declaration[59] as well as the affidavits of William McNeil,[60] Burnell Bohn, Frank Young, Howard Schaller,[61] and the March 7, 1991 BPA graphic analyses of projected spawning escapements based upon variable subbasin conditions, as well as the affidavits, declarations and biological opinions and assessments that were submitted as attachments to the parties' extensive memoranda.[62] From what I have reviewed, I do *not* see how, even if they had standing under the ESA to challenge harvest activities, plaintiffs could succeed on such a "technical difference of opinion" which was soundly rejected by the Ninth Circuit in *Mt. Graham Red Squirrel.* It is *because* these specialists have sharply conflicting views that the agencies then have the discretion to rely upon whichever reasonable opinions they choose. Even if I found the contrary views more persuasive, I could not substitute my own judgment for that of the agencies. *Id.,* at

57. This is not to suggest that judicial review is unavailable *because* plaintiffs' complaints raise political questions. *Compare Japan Whaling Ass'n v. American Cetacean Soc.,* 478 U.S. 221, 230–231, 106 S.Ct. 2860, 2866–2867, 92 L.Ed.2d 166 (1986) (holding 'political question' doctrine did not bar judicial review of Secretary's decision not to certify Japanese whaling vessels). I fully recognize that the ESA confers such authority upon this court, and thus, my comments are limited to drawing a comparison between the harvest allocation dispute and the present dispute over water allocation.

58. As I noted *supra,* NMFS and most biologists agree that timing and area restrictions on ocean and in-river harvests result in harvests that have *no* impact on Snake River sockeye and only a minimal impact, if any, on listed spring/summer chinook.

59. Although I recognized many of the experts from my experience with *U.S. v. Oregon,* I am unfamiliar with Stevenson's background and the only information provided is that he obtained a B.S. from Eastern Washington University and held a job with the Grant County P.U.D. Stevenson's report is based upon four different harvest scenarios ranging from 0% to 80% depending upon the stock season. Stevenson's premise is that harvest reductions result in a great number of spawners and his charts show predicted impacts of harvest rate reductions on "total spawners." For example, he posits that a 40% harvest

rate on Snake River fall chinook would result in a six fold increase in the maximum return size over a 40 year period.

Stevenson's 40% figure corresponds to Graham Gall's estimate that if non-treaty commercial harvest in the PFMC area and Zones 1–5 were eliminated, the harvest rate on Snake River fall chinook would be 40%. However, Gall's figure does not include impacts of fishing from the NPFMC area or Canadian harvests.

60. McNeil is a well qualified fisheries scientist retained by plaintiffs to review defendants' recommendations for 1992 FCRPS operations. McNeil concludes that the NMFS biological opinion "overstates the importance of flow alone" and that "there is no convincing relationship between migration of juvenile chinook and flow in the Columbia River."

61. Schaller directly rebuts Stevenson's analysis and describes the regional effort underway to better integrate information from life-cycle modeling systems.

62. Legal scholars are similarly divided. *Compare e.g.,* Michael Blumm and Andy Simrin, *The Unraveling of the Parity Promise: Hydropower, Salmon and Endangered Species in the Columbia Basin,* 21 Envtl.L. 657 (1991); with Kai N. Lee, *Rebuilding Confidence: Salmon, Science, and Law in the Columbia Basin,* 21 Envtl.L. 745 (1991).

1576, 1580–81; *See also Louisiana v. Verity*, 853 F.2d 322, 332 (5th Cir.1988) (failure to address all contributing causes of degradation does not invalidate agency effort to contain one cause).

In this case, although plaintiffs and ultimately all consumer rate payers have and will continue to suffer the economic consequences of the BPA's efforts to mitigate the decline of the listed salmon species, I find that the injury suffered by the rate payer is simply too attenuated from any harm caused by defendants' alleged failure to fulfill both procedural and substantive duties imposed by the ESA. Further, I find that redressibility of the economic impact of BPA's measures via the ESA is both remote and speculative. In addition, I find that Article III, when read with the purposes of the ESA, requires that a judicial officer consider the listed species as a kind of "ward" of the court. Like any other ward, part of my responsibility is to ensure that the listed species will be adequately represented by counsel who will advocate its rights and seek its protections to the fullest extent of the law. I realize, as counsel so persuasively pointed out during oral argument, that this kind of an approach could, if taken too far, become an impossible quest for a pure hearted Galahad. However, in this case I find that the conflict between the plaintiffs themselves and the species they seek to protect through circumspect and carefully crafted complaints is simply too great to withstand. Based on the foregoing, I find that plaintiffs lack standing to pursue their claims against defendants under §§ 7 and 9 of the Endangered Species Act. Because I have reviewed all of the submissions and alternative theories for dismissal, I address them *infra* to complete the record.

### 2. *Ripeness/Mootness*

As an alternative basis for summary judgment, government defendants contend that plaintiffs' claims against agency action in 1992 with respect to harvest, and hydropower operations and inaction with respect to hatchery and habitat activities (i.e. their failure to consult or the adequacy of their consultations) are moot. In addition, defendants argue that any current or future actions are not yet ripe for judicial review because they are currently "in the process" of conducting consultations on long term project operations. The 1992 biological opinions expired by their own terms in 1992. Defendant NMFS expects to issue a new biological opinion on FCRPS operations by the end of March 1993. Stipulated Fact # 112.

A controversy is "moot" when the "issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Friends of the Payette*, 988 F.2d at 996. Defendants bear a "heavy burden" of demonstrating that plaintiffs' claims are moot. *Greenpeace Action v. Franklin*, 982 F.2d 1342, 1348 (9th Cir.1992). Further, mootness must be determined on a claim by claim basis. *See e.g. Headwaters, Inc. v. Bureau of Land Management*, 893 F.2d 1012, 1015–16 (9th Cir.1989) (separately addressing mootness issue as to injunctive relief and declaratory relief). Although I cannot grant plaintiffs effective relief insofar as their claims relate to 1992 operations, I must nevertheless determine if this is one of those "extraordinary cases in which the complained of activity may be repeated and yet evade review." *Greenpeace*, 982 F.2d at 1348. In *Greenpeace*, the court rejected a similar defense of "mootness" to claims against the Secretary of Commerce for alleged ESA and NEPA violations in issuing total allowable catch regulations governing pollock fishing in the Northern Pacific Ocean. The court based its conclusion on three factors: (1) the challenged regulation was in effect for less than one year; (2) the Secretary relied upon the same biological opinion in 1992 as she did in 1991; and (3) the public's "continuing ... interest in determining the standards governing the Secretary's decision to authorize a certain level of pollock fishing." *Id.*

Applying the standards in *Greenpeace* to the four challenged "sectors" of activity in this case yields different results. As to habitat issues, the government has proffered the declaration of John Lowe, Regional Forester for the FS, who indicates that the FS has determined that at least 800 agency actions are "likely" to adversely affect the listed species and that they are currently working with the NMFS on a structure for a cumulative effects analysis. However, there is noth-

ing beyond these broad generalizations to support a finding that 1993 will significantly differ from 1992. When I also examine Lowe's deposition, it appears that there still have been no biological opinions produced and that he is unaware of any policy changes directly responsive to the salmon listing. Deposition at 75–76. The status of grazing allotments, management plans, and mining operations were unknown. Lowe's discussion of "smolt production" objectives related back to original forest plans prepared prior to the listings. Deposition at 75–76. Further, although there appeared to be some confusion during the questioning with respect to terminology, at points in the deposition Lowe indicated that even if the Forest Service determined that a project may affect the listed species, formal consultation with the NMFS would not be required unless the action placed the species "in jeopardy." Deposition at 97. Such a conclusion is clearly contrary to the dictates of § 1536(a)(2). *See Thomas,* 753 F.2d at 763 ('may affect' determination triggers formal consultation to determine if project likely to jeopardize species).

Further, the joint declaration of Richard Bastin and Elaine Zielinski, Deputy State Directors for the BLM for land in Oregon, Washington and Idaho, reveals that the BLM is working from plans and salmon protection goals developed in 1987, 1988 and 1991. Like Lowe, when questioned during her deposition about specific affirmative responses to the listings, Zielinski was unaware of the status of § 7 consultations or whether any ongoing land use activities had been halted pending review.

▬ Regardless of the *merits* of plaintiffs' underlying challenge and regardless of where the burden of proof lies once we move from "mootness" to the extraordinary case which may evade review, I find that—if specifically identified—salmon habitat issues in 1992 are of the type which are capable of repetition and yet may evade review. Again, however, because these plaintiffs have relied upon generalized claims of ESA violations by defendants within the habitat sector, it is

impossible at this time to tell if the generalized failures are of such a short duration that they may evade review. *See National Wildlife Federation,* 497 U.S. at 899, 110 S.Ct. at 3194 (no general judicial review of BLM's day-to-day activities).

▬ Although defendants admit that no formal consultations on hatchery issues were undertaken in 1992, they note that defendants did engage in informal "conferencing" under § 7(a)(4) and that the agencies are "now engaged in" formal § 7 consultations with the NMFS. Based upon the affidavits of Gary Smith, Deputy Regional Director for the NMFS, Ernest Harrell, COE Division Engineer, and the declaration of William Shake, Assistant Regional Director for the FWS, I find that the government has adequately demonstrated that its inaction with respect to hatchery operations in 1992 is moot and is unlikely to repeat in 1993. Once formal conferencing in 1993 is complete, defendants' actions may be subject to challenge. Thus, plaintiffs' 1992 hatchery specific ESA claims are moot and not ripe.

Harvest and hydropower issues are a much closer call. According to Smith, for 1993 the NMFS is conducting § 7 consultations *"simultaneously"* in all four sectors—hydro, harvest, hatcheries and habitat. In his deposition, Smith explained that NMFS has assigned staff members to each of the four areas: Brian Brown for hydropower, Mike Delarm for hatcheries, Dr. Peter Dygart for harvest and Elizabeth Garr for habitat. Smith anticipates that this "grouping" will allow them to evaluate "total combined impacts" of agency actions. However, Smith then goes on to explain the status of consultations in each of the separate sectors. He anticipates that the newly developed "life-cycle models" will be a "crucial tool" in evaluating and monitoring the progress of the listed species in the hydropower sector;[63] that the Pacific Salmon Treaty negotiations with Canada were underway with respect to harvest regimes; that habitat consultations were underway on 70 actions out of 10,000 actions which the FS has indicated may af-

---

**63.** *See also* Affidavit of Howard Schaller, ODFW Biometrics Program Leader, discussing life cycle

modeling systems.

fect the listed salmon; and that all federal agencies participating in hatchery operations (FWS, COE and BPA) are collaborating on biological assessments. Thus, Smith contends that the NMFS will conduct more consultations in 1993, which will be more comprehensive by "grouping related and similar actions in a single consultation."

Ernest Harrell from the COE also anticipates that 1993 operations will be "more comprehensive" than was seen in 1992, with greater emphasis on water management activities. Harrell also sees the continuation of long term studies, monitoring and efforts towards improving fish passage facilities by 1998. Walter Pollock, an assistant administrator for the BPA, also anticipates greater efforts toward protection of fish migration in 1993 than was taken in 1992—however, again, most of the proposals relate to unquantified improvements from actions taken in 1992. Further, Pollock indicates that "flow augmentations" to improve fish migrations *will* continue in 1993 under the Drought Response Management Plan and an EIS entitled "Interim Columbia and Snake Rivers Flow Improvement Measures for Salmon," confirming plaintiffs' fears that water will continue to be diverted for fish protection measures.

Plaintiffs' claims that defendants must consider all four sectors in a single "comprehensive" review also appears unlikely. As I read Smith's affidavit and deposition, defendants' plans for "grouping" will involve, for example, coordinating all of the various agencies' hatchery operations. Defendants do not indicate that they plan to issue a single biological opinion which addresses each of the four sectors, although they are continuing to work on the creation of the integrated Life Cycle Model. Furthermore, as for harvest issues, the 1992 in-river biological opinions each indicate that they had considered hydro and ocean harvests in reaching their conclusions, so "grouping" in 1993 should be nothing new for the harvest sector. Thus, although the agencies will not be relying upon 1992 biological opinions in 1993, their failure or inability to conduct "comprehensive" consultation is the type of challenged action which is likely to be repeated, yet potentially evade review due to the biological opinions' short durations. In fact, the biological opinion and

incidental take statement issued on March 1, 1993 covering winter, spring and summer in-river fisheries, recognizes that NMFS is still unable to consider a combined effects analysis for 1993.

▬▬ Therefore, without addressing the issue of whether 1992 actions were or were not lawful under the ESA, I do not see that defendants' plans for 1993 represent such a significant departure from 1992 activities to hold that defendants are incapable of repetition. Similarly, although defendants conceded that consultations for 1992 Alaskan fisheries were not undertaken, defendants' claim that they will occur in 1993 is belied by the fact that the season was underway as of February 19, 1993 without an incidental take statement. Thus, these claims for relief are neither moot nor unripe.

Similarly, plaintiffs' claims regarding the *applicability* of the "incidental take" concept to commercial fishing activities is one that the government readily admits will occur again because it disagrees with plaintiffs' basic premise about incidental takes, discussed further *infra*. Thus, the "incidental take" issue regarding harvests is also neither moot nor unripe.

▬▬ To the extent that plaintiffs challenge the *amount* of take authorized, analysis of this issue will differ from year to year, because ocean and in-river harvests are gauged by escapement percentages rather than raw numbers so that actual catches vary with seasonal conditions. Reports on this year's potential harvest indicate that 1993 may be a record low year for ocean and in-river fishing. Thus, the amount of take authorized in 1992 will in all likelihood not be repeated in 1993. The government has submitted affidavits in support of its contention that 1993 consultations will be "more comprehensive" and will involve newly created "integrated life-cycle models." The government also points out that the Pacific Salmon Treaty with Canada is in the process of renegotiation and that these negotiations "may result" in additional § 7 consultations.

However, like the plans challenged in *Greenpeace*, ocean and in-river harvest plans are in effect for less than one year, leaving a court with very little time to complete judi-

cial review. Similarly, there is an equally strong argument in this case that there is a "continuing public interest" in determining what standards should guide the secretary's discretion in authorizing harvests limits. Although the affidavits submitted by the government evince an intent to improve efforts, increase studies, etc.—they do *not* evince an intention to make any radical departures from their past practices.

Based on the foregoing, although plaintiffs' claims against habitat management are too broad under *National Wildlife Federation*, I find that defendants' submissions relative to habitat issues fail to demonstrate that the Forest Service and the BLM have affirmatively responded to the salmon listings and that alleged non-compliance in 1992 is moot and will not continue into 1993 and beyond. I find that, although plaintiffs' claims with respect to harvest and hydropower biological opinions are moot for 1992, they fall within the range of those extraordinary types of challenges which are capable of repetition, yet evading review. Finally, with respect to hatcheries, I find that the government has come forward with sufficient evidence to demonstrate that their failure to conduct formal consultations in 1992 is moot and unlikely to be repeated in 1993.

### 3. *Necessary Parties & the "Incidental Take" issue*

PPC and DSIs' motions for partial summary judgment seek a ruling that, as a matter of law, defendants may not lawfully authorize the trade or transport of the listed species via the incidental take permits issued on May 1, and June 12, 1992 insofar as they relate to commercial fisheries under § 9 and 7. Plaintiffs argue that the incidental take statements are invalid because: (1) the takes authorized are "direct" and not "incidental to" an otherwise lawful activity; and (2) members of the listed species have been included within commercial harvest and have been sold and transported in violation of § 9's prohibition on the trade or transport of listed species; and (3) they fail to specify an impact on the species; and (4) fail to specify adequate "reasonable and prudent" mitigation measures or terms and conditions of implementation. PPC also seeks summary

judgment on its claim that the NMFS violated § 7 by failing to consult with the NPFMC on ocean fisheries off the coast of Alaska.

Under these theories, plaintiffs contend that the court should enjoin any further authorizations of *commercial*, non-tribal harvests. Plaintiffs argue that, since the relief sought does not directly implicate tribal fishing rights and because the claims are against the government's illegal activities, complete relief under these claims may be afforded without joinder of treaty tribes. In addition, plaintiffs contend that the tribes have had their chance to intervene and have, therefore, in essence, waived any objection. Plaintiffs further argue that, because the tribes' interests are "aligned" with those of the government, any interest they have in this litigation is adequately represented by existing parties.

■ On the first point, I agree with defendants, intervenors and amicus that the lawful activities authorized by the incidental take permits were commercial fisheries directed at non-listed species. There is no dispute that there are no fisheries, commercial, recreational or tribal, which are "directed at" listed species as was the case in *Sierra Club v. Clark*, 755 F.2d 608, 610–611 (8th Cir.1985) (authorizing sport trapping of listed timber wolves). Nor is there any dispute that some listed species may be included in the commercial take. In these cases, I recognize that the lawful underlying *activity* and the "incidental" *activity* are identical (i.e. they are both "fishing") unlike other instances of recognized incidental takes, *see e.g. Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 982 (9th Cir.1985) (incidental take of Mission blue butterfly issued to real estate developer). However, there is nothing in the ESA directed against activities *per se*, but rather the Act is aimed at the overall protection of a species, subject to the incidental take exception under § 7. *See e.g. Louisiana v. Verity*, 853 F.2d 322 (5th Cir. 1988) (upholding NMFS regulation of shrimp trawlers re incidental take of protected sea turtles). Further, I find that plaintiffs' strict construction of § 9 would, in effect, eliminate or ignore the 1982 Amendment to § 7 which was specifically designed to authorize incidental takes *following* consultations.[64]

---

64. Plaintiffs' citation to *United States v. Ron Pair*  *Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026,

■ As for plaintiffs' distinction that, although incidental "takes" may be authorized, transport and trade of endangered species may never be authorized—I find that their argument misses the mark on several grounds. First, the incidental take statements do not authorize transport and trade in listed species. Second, even if I accept the affidavits of plaintiffs' experts as true—i.e. that an unknown number of listed species would have been taken in the commercial harvest and therefore, must have been transported and sold—if strictly applied to a context where the listed species are identical to non-listed species, would again lead to a result which is contrary to the incidental take amendment. Second, Congress' purpose in adding the "transport" and "sale" proscription was to deter those who might want to take endangered species *because* of their limited availability. *See* H. Rep. No. 93–412, 93d Cong., 1st Sess. (1973), U.S.Code Cong. & Admin.News 1973, p. 2989. Furthermore, the ESA contemplates that there may be circumstances in which protection of a listed species requires protection of a non-listed species which so closely resembles the listed species in appearance as to make the difficult an "additional threat." 16 U.S.C. § 1533(e). Defendants have not issued regulations requiring that other salmon stocks or races be treated as listed species under this provision and, to the extent their failure to do so is subject to challenge, it raises a matter relative to the merits which may only be resolved following a complete review of the administrative record.

To the extent that plaintiffs premise their motions for partial summary judgment upon the adequacy of defendants' § 7 consultations or the adequacy of the incidental take statements themselves, their motion is denied as premature since the parties have yet to file the administrative record and we have yet to proceed to the underlying merits of these actions.

■ Plaintiffs' claim that the incidental take statements are facially *invalid for failing* to identify specific impacts (i.e. an anticipated *number* of listed species to be harvested) is belied by clear legislative history which demonstrates that Congress fully anticipated that there would be occasions when impacts would have to be estimated. *See* S.Rep. No. 97–418, 97th Cong.2d Sess. 21 (1982), U.S.Code Cong. & Admin.News 1982, p. 2807 (take specification not a "quota" requirement); H.R.Rep. No. 97–567, 97th Cong., 2d Sess. 27 (1982), U.S.Code Cong. & Admin.News 1982, p. 2827:

> "Section 7(b)(4) requires the Secretary to specify the impact on such incidental taking on the species. The Committee [on Merchant Marine and Fisheries] does not intend that the Secretary will, in every instance, interpret the word impact to be a precise number. . . . For example, it may not be possible to determine the number of eggs of an endangered or threatened fish which will be sucked into a power plant . . ."

■ Because I disagree with plaintiffs' application of §§ 9 & 7 to the incidental take statements issued with the May 1, and June 12 biological opinions authorizing PFMC area ocean and in-river harvests in Zones 1–5, I need not address the issue of whether the tribes are necessary parties. I do note, however, that dismissal of an action is appropriate based upon a failure to join indispensable parties if there is: (1) prejudice to a party or the absent party; (2) relief cannot be shaped to lessen the prejudice; (3) where an adequate remedy cannot be afforded without the absent party; and (4) where an alternative forum exists.[65] *Confederated*

103 L.Ed.2d 290 (1989) in support of their proposition that the language of ESA § 9 is clear and unambiguous and therefore, must be applied according to its terms—is again, somewhat misleading. In *Ron Pair*, the Court addressed the meaning of a provision of the bankruptcy code and in so doing, it merely set forth standard guidelines for statutory interpretation—that a court must start with the language of the statute itself and, if literal application would produce a result "demonstrably at odds" with the intentions of the drafters, the court should look at that

intent. *Id.*, at 240–41, 109 S.Ct. at 1030. Thus, in examining ESA § 9 *with* § 7 and congressional history, I am fulfilling that mandate.

**65.** As I noted earlier, an appropriate alternative forum likely exists for these plaintiffs under the provisions of the NWPA. Furthermore, "a plaintiff's interest in litigating a claim may be outweighed by a tribe's interest in maintaining its sovereign immunity." *Chehalis*, 928 F.2d at 1500.

*Tribes of the Chehalis Indian Reservation v. Lujan,* 928 F.2d 1496, 1499 (9th Cir.1991). The moving party bears the burden of persuasion. *Makah Indian Tribe v. Verity,* 910 F.2d 555, 558 (9th Cir.1990).

Because plaintiffs' theories focus upon the nature of the harvest activity itself, and because the tribes also engage in commercial fishing activities substantially similar to those engaged in by non-tribal harvesters, even had I agreed with plaintiffs, I do not see how I could have done so without directly implicating tribal fishing interests. Indeed, plaintiffs' own experts have included tribal commercial harvests in their calculations of in-river harvest rates. *See* Affidavit of Burnell Bohn, Feb. 22, 1993, at 5. The issue of supremacy of tribal treaty rights versus environmental statutes and regulations has yet to be directly confronted within *U.S. v. Oregon. See* CRFMP I.B.2 (treaty tribes "will be accorded the opportunity to harvest their shares ... by such reasonable means ... as are compatible with conservation requirements."). To find that all commercial fishing constitutes an illegal "take" under the ESA would prejudice the treaty tribes by requiring them to establish that their own commercial harvests were nevertheless lawful *because* their rights are derived from treaties. Although plaintiffs dismiss this as being "another case," they do so to their own benefit (by "crafting" their claims), but to what is, for all practical purposes, an obvious detriment to the treaty tribes. *See Makah Indian Tribe,* 910 F.2d at 559 (dismissal appropriate as to issues relative to inter-tribal reallocation where joinder of other tribes impossible given tribes' sovereign immunity; dismissal inappropriate as to claims relative to procedural violations).

To say that the tribes' interests are so "aligned" with those of the government that they are already adequately represented flies in the face of decades of controversy and, again, fails to take into consideration that parties that are in agreement now may be in bitter disagreement within a very short time frame.[66] Further, to imply that the tribes may have waived objections by failing to intervene when given the opportunity, is in direct contravention of tribal rights to sovereign immunity. *See e.g. Chehalis Indian Reservation,* 928 F.2d at 1499–1500 ("[t]ribes are sovereign entities immune from nonconsensual actions in state or federal court."); and *Makah Indian Tribe,* 910 F.2d at 557 (waiver of sovereign immunity must be explicit).

## VI.  *Conclusion*

Based on the foregoing, I find that plaintiffs lack standing to pursue claims under the Endangered Species Act. I reject the government's alternative argument that the issues raised are moot and not ripe, except as the claims relate to defendants' failure to conduct ESA § 7 consultations on hatchery issues in 1992. Accordingly, defendants' motions for summary judgment # 38 and # 54 (Civ. 92–973); # 44 (Civ. 92–1260); and # 53 and # 72 (Civ. No. 92–1264); and Intervenor State of Oregon's motions for summary judgment # 110 (Civ. 92–973); # 128 (Civ. 92–1260); # 142 (Civ. 92–1264) are GRANTED. Plaintiff DSIs' motion for partial summary judgment # 28 (Civ. 92–1260) and Plaintiff PPC's motion for partial summary judgment # 40 (92–1264) are DENIED.

In Civ. 92–973–MA, plaintiff PNGC's motions to compel (# 112), to extend deadlines (# 126, 127, 161), *pro hac vice* (# 94) and

---

**66.** Within *U.S. v. Oregon,* in July of 1991, the Confederated Tribes of the Colville Reservation sought to establish treaty rights in a trial in which the Yakima, Nez Perce, Warm Springs and Umatilla Tribes objected while the Federal government and the States of Oregon, Washington and Idaho took no position. In October of 1991, the Yakima Indian Nation filed an emergency appeal to this court for a restraining order against the States of Washington and Oregon to permit the Yakimas to fish an extra 3 days. The United States took "no position." Then in February of 1992, the State of Washington sought an injunction against a Clatsop County Circuit Court

order allowing a 3–day extension to a non-Indian commercial gillnet fishery. In July of 1992, the Nez Perce sought an emergency restraining order against the Shoshone Bannock Tribe's fishing season, with Idaho taking no position on the season, but objecting to the geographic scope of the Nez Perce's appeal within the CRFMP framework.

I summarize this activity only to demonstrate the fallacy of assuming that any of these parties can "adequately" represent the interests of the other. While their interests may be aligned at this time, that status is as likely to change as the seasons.

defendants' motion for protective order (# 141) are MOOT. In Civ. 92–1260–MA, DSI plaintiffs' motions to compel (# 130), to extend deadlines (# 147, 148, 190) and defendants' motion for a protective order (# 171) are MOOT. In Civ. No. 92–1263–MA, plaintiff PPC's motions to compel (# 122), to extend deadlines (# 145, 146, 184) and defendants' motion for protective order (# 161) are MOOT.